UNITED STATES, Appellee,

v.

William Spencer BENEDICT, Chief Yeoman, U.S. Coast Guard, Appellant.

No. 00–0617.
Crim.App. No. 1083.

U.S. Court of Appeals for the Armed Forces.

Argued May 22, 2001.

Decided Sept. 27, 2001.

Baker, J., filed concurring opinion.

Effron, J., filed dissenting opinion.

CRAWFORD, C.J., delivered the opinion of the Court, in which SULLIVAN, GIERKE, and BAKER, JJ., joined. BAKER, J., filed a concurring opinion. EFFRON, J., filed a dissenting opinion.

For Appellant: *Barry E. Ryan* (argued); *Commander Jeffrey C. Good.*

For Appellee: *Lieutenant Mark A. Cunningham* (argued).

Chief Judge CRAWFORD delivered the opinion of the Court.

On September 4–6, 1996, pursuant to his pleas, appellant was convicted of making false official statements and larceny, between July 1993 and February 1996, in violation of Articles 107 and 121, Uniform Code of Military Justice, 10 USC §§ 907 and 921, respectively. On February 14, 1997, the convening authority approved the sentence imposed by officer and enlisted members of 1 year's confinement, a fine of $5,000, and reduction to pay grade E–4. We granted review of the following issues:

I. WHETHER THIS CASE SHOULD BE REMANDED TO THE COURT OF CRIMINAL APPEALS FOR A DETERMINATION AS TO: (A) WHETHER IT WAS ERROR TO ADMINISTRATIVELY REDUCE APPELLANT 14 DAYS AFTER HE ENTERED CONFINE-

MENT; AND (B) THE IMPACT, IF ANY, OF *UNITED STATES V. GORSKI,* 47 MJ 370 (1997) UPON APPELLANT'S RETIRED PAY.

II. WHETHER THE CONVENING AUTHORITY FAILED TO SELECT THE COURT–MARTIAL MEMBERS IN ACCORDANCE WITH ARTICLE 25, UCMJ, 10 USC § 825 BECAUSE HE WAS PRESENTED WITH AN IMPERMISSIBLE FAIT ACCOMPLI AS TO THE COMPOSITION OF THE PANEL. *SEE UNITED STATES V. MARSH,* 21 MJ 445 (CMA 1986).

Based on the Government's concession, we order a hearing under *United States v. Du-Bay,* 17 USCMA 147, 37 CMR 411 (1967), to determine whether appellant was reduced in grade 14 days after entering confinement and (2) whether automatic forfeitures were assessed against appellant's retirement pay. Final Government Brief at 9–10. Such hearing should be held in an expeditious manner. As to Issue II we hold that the convening authority selected the court members in accordance with Article 25.

## FACTS—ISSUE II

Pursuant to a semi-annual solicitation of court members, Commander (CDR) James E. Litsinger, Deputy of the Administration Division, 13th Coast Guard District, received approximately 30 nominees to serve on a court panel to sit for 6 months. The solicitation for the member pool is done whether or not a court-martial is scheduled. He then culled out those officers who were near retirement, pending transfer orders, or on critical temporary duty. Because of the request for enlisted members, he also sent out more questionnaires for potential enlisted members. However, because the pool was small, Captain (CAPT) Sinclair, the Chief of Staff of the District, encouraged the command to send in other nominees for a much larger pool. None of the questionnaires were removed. Of the nominees submitted, none were from CDR Litsinger's district. He forwarded the remaining nominations to "the convening authority." However, he admitted that rather than sending those directly to the

convening authority, he sent them through CAPT Sinclair. In his note, CDR Litsinger asked the Chief of Staff to "select" 9 prospective members. CDR Litsinger testified that the convening authority personally selected the members. CDR Litsinger testified that sometime later a secretary in his office received a list of members from "the front office" with a note that said, "These folks have been selected." She then prepared a convening order based on that list.

The convening authority specifically told CDR Litsinger and the Staff Judge Advocate (SJA), Captain Judith Hammond, that he selected the court members. To "avoid bringing the convening authority in," the judge played back CDR Litsinger's testimony that the admiral personally selected the members. CAPT Sinclair testified that he received a package of member questionnaires from the administrative officer. Several prospective members had been eliminated because of service on a prior court-marital. CAPT Sinclair then testified as follows:

> I screened through the names, developed a list of—I don't recall how many, might have been six or so, for nomination for this court. I screened the names to look for those who I thought would be available, we didn't know when this court would be convened, so we didn't know when—what exact window of opportunity we were aiming at. So, I looked for those who were generally available. Those who seemed to meet the criteria of not having direct knowledge of the case, the best I could determine. I didn't know who all the witnesses might be, so we just took what appeared to be those who wouldn't have direct knowledge. From that list I gave the secretary the shorter list and asked her to have the convening order prepared for recommendation to the District Commander.

Q [TC]: Do you recall when that recommended convening order came back to the Admiral's office or if it ever did?

A: Came back to be presented to him?

Q: Yes.

A: No. It was a few days later, I guess.

Q: Do you recall a meeting when that recommended convening order was presented to the Admiral?

A: I checked the typing of the convening order, it appeared to be correct. It was all the same names that I had checked off on the handwritten list, and I presented that to the District Commander and said "Here's who I recommend you consider for the upcoming court."

Q: Prior to that presentation, did you have any discussion with the Admiral regarding the composition or the recommended composition?

A: None at all. No.

Q: Do you know whether or not the members' questionnaires were made available to the Admiral?

A: I do not recall. No, I don't recall. They were in a manila folder but I don't remember if I sent them with the convening order or not.

Q: Would you have substituted anyone if the Admiral had asked to have anyone substituted?

A: It didn't come up, so I don't—I don't think I would have without discussing why. If there was any reason why. As it worked out, subsequently, some people on that court did have other conflicts and I think at least one may have become a witness and had to be eliminated. So there was a later process to generate additional members.

Q: That was a—there was some other action taken by a different Admiral, I believe.

A: Pardon?

Q: Admiral Spade actually did that amendment later on?

A: Yes. When—I think we eliminated maybe four, for various reasons. Once the date had been set and we knew of specific conflicts and had to eliminate one or two people for that, I think at least one became a witness and had to be eliminated. So then we went through the same process, essentially, to generate additional members.

\* \* \*

Q: Captain, you testified that there was an amendment to this convening order at some later time. Do you know whether or not Admiral Spade was provided with the members' questionnaires in conjunction with that selection and relief of officers in that amendment?

A: As with the first selection, there was a folder with questionnaires in it, but I don't recall if that went in with the— actually, I wouldn't have knowledge of whether that folder went in with the convening order that I had drafted for his consideration. Because it was routed through.

Q: What is your [sic] decision ·with respect to the first convening order, was it your decision about the composition of the panel or was it the Admiral's decision?

A: To my impression it was the Admiral's decision.

Q: If the Admiral had wanted other members on that panel, would you have complied with his desires?

A: I would have to hear his reasons for such, but I made him recommendations and I felt they would be good enough recommendations that I had the convening order typed, not as a draft but as a final, and sent it in for his consideration. It would have been easy for him to have a change.

Q: It would have been easy for him to have a change?

A: Certainly. He would have just scratched out–or whatever if he had members on there he thought I was inappropriately selecting.

Q: What—In your understanding, who was the final determiner of the members of this court?

A: My understanding, my feeling, was he made the decision.

* * *

Q [DC]: Is it a fair statement for me to say, Captain, that this was a duty that is one that is typical of one that is delegated to you as the chief of staff on behalf of the Admiral? To do these functions?

A: The administrative review and have developed a list? That's what chief of staff does, yes.

Q: At the time the Admiral signed the original convening order, if I understood your testimony for that, Captain Hammond's doesn't matter; there were no changes made whatsoever?

A: At the time he signed the original convening order, there were no changes.

Q: The only changes were at a later date there were amendments made to add or delete people because of change of circumstances?

A: Correct.

CAPT Hammond testified that she was present at a meeting in Admiral (ADM) Lockwood's[1] office on April 16, 1996, when the convening authority was presented with a package including the proposed convening order and pretrial investigation. She did not know whether the questionnaires were included in the package, but testified that it was the normal procedure for those items to be included. The Admiral went "through the package," but did not make any comments about any particular member and did not add or delete any names on the list. CAPT Hammond stated her "conclusion" that the convening authority had made a decision as to the composition of the court-martial when he signed the convening order. Right after signing the order, the convening authority could have changed any of the members. On cross-examination CAPT Hammond testified that the convening order had been prepared prior to the meeting and submitted as part of the investigation.

The judge found:

I find that the convening authority did personally select the court members. In the case of the original convening order, he said so, and there is nothing about the process followed—in which the Chief of Staff submitted his written recommendation of the members to be named by the convening authority, who then personally signed the convening order—to suggest impropriety for either that convening order or the amendment.... In short, the presumption of regularity is not confronted with any evidence at all that would provide a basis for a finding that this court was not properly convened.

DISCUSSION—ISSUE II

■ The issue is this case is whether the convening authority personally detailed the court members pursuant to Article 25(d)(2). While the convening authority did not testify, the military judge found that the convening authority personally selected the members. App. Ex. LXIX. This Court is bound by the judge's finding of fact unless it is clearly erroneous. *See, e.g., United States v. Burris,* 21 MJ 140, 144 (CMA 1985). Reliance upon staff work does not undermine the findings in this case. While the judge used the term "presumption of regularity" to reach these findings, the term is used in the sense of a permissive inference that might be drawn from the evidence presented. "Inferences and presumptions are a staple of our adversary system of factfinding. It is often necessary for the trier of fact to determine the existence of [a] ... fact—from the existence of one or more 'evidentiary' or 'basic' facts." *County Court of Ulster County, New York v. Allen,* 442 U.S. 140, 156, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

The testimony presented was that the convening authority personally selected the nine prospective members set forth by the Chief of Staff. He then personally signed the order later. Other orders amending the original orders were personally signed by the convening authority. These findings are not

---

**1.** The original convening authority. It appears that Admiral Lockwood departed in a normal change of duty and was succeeded in command by Admiral Spade, who signed the amending orders and referred the additional charges to trial.

undermined by the fact that the convening authority selected the nine perspective members put forth in an order prepared by the Chief of Staff.

 This Court has held in the past that the "convening authority may rely on his [or her] staff to nominate court members." *United States v. Marsh*, 21 MJ 445, 449 (CMA 1986); *United States v. Kemp*, 22 USCMA 152, 46 CMR 152 (1973). As this Court stated in *Kemp*, 22 USCMA at 155, 46 CMR at 155:

> [W]e have recognized that the convening authority ... must have assistance in the preparation of a panel from which to choose those members. In order to carry out his function under Article 25, he must necessarily rely on his staff or subordinate commanders for the compilation of some eligible names.

 The Court in *Kemp* upheld the selection of members from a list compiled by the Office of the Assistant Chief of Staff for Personnel. Likewise in *Marsh* the Court upheld Lieutenant General Becton's selection of the members from a slate recommended by the staff judge advocate on the day of the trial. 21 MJ at 448–49. All the witnesses in the present case testified that it was the convening authority's decision that resulted in the selection of the members. At the time of the selection, ADM Lockwood was asked by the SJA, in the presence of CDR Litsinger, "Admiral, did you select these members?" The convening authority replied, "Yes, I did." This testimony and the convening authority's personal signature on the convening order support the finding by the military judge.

The decision of the United States Coast Guard Court of Criminal Appeals is set aside. The record of trial is returned to the General Counsel for the Department of Transportation for action not inconsistent with this opinion.

BAKER, Judge (concurring):

In *United States v. Kemp*, 22 USCMA 152, 155, 46 CMR 152, 155 (1973), we recognized that "the convening authority, while charged with the personal responsibility for the selection of court members, must have assistance in the preparation of a panel from which to choose those members." In *United States v. Marsh*, 21 MJ 445, 449 (CMA 1986), this Court introduced a gloss on *Kemp*, suggesting that Article 25, Uniform Code of Military Justice, 10 USC § 825, required the convening authority to do more than ratify a staff application of the Article 25 criteria; however, the Court determined that although the convening authority was not confronted with the decision on replacement members for a panel until the day of trial, and in circumstances suggesting a *fait accompli* (*e.g.*, members had already been contacted), there was no Article 25 violation because the convening authority had previously selected these officers for another panel. As a result, the convening authority "had sufficient time to assess their qualifications in terms of the criteria specified in Article 25(d)(2)." Appellant seeks to explore the gap, if any, between this Court's reasoning in *Kemp* and *Marsh*.

I agree with the dissent's formulation of the question presented. The issue in this case is not whether the convening authority signed the convening order and thereby personally selected the members (appellant is not arguing that the convening order was stamped or auto-penned), but whether he properly selected the members by applying the criteria of Article 25 when doing so. I also agree with the dissent that the absence of testimony by the convening authority in this case, on these facts, with this level of trial litigation, is inexplicable.

Nonetheless, as a matter of law, the evidence does not demonstrate that the convening authority was presented with a *fait accompli* and failed to comply with Article 25. Rather, the evidence suggests that certain subordinates may have wished they could present the convening authority with a *fait accompli* and might have tested the convening authority's exercise of his authority. But in any event, this attitude was not put the test. The convening authority was presented a proposed list of members at a meeting on April 16. Captain Hammond, his legal officer, testified she "saw him go through the package." Two days later, the convening authority signed the order appointing mem-

bers. Thus, in contrast to the facts in *Marsh,* the convening authority had time for deliberation before personally selecting the members on April 18, by signing the convening order. Moreover, the convening authority's knowledge of Article 25 was not put in question by defense counsel or trial counsel at trial.

EFFRON, Judge (dissenting):

The record in the present case fails to demonstrate that the convening authority fulfilled his Article 25, UCMJ, 10 USC § 825, responsibility to select personally those members best qualified for service on the court-martial panel. I respectfully dissent.

## I. BACKGROUND

### A

As a matter of constitutional law, "trial by jury in criminal cases is fundamental to the American scheme of justice." *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). "[T]rial by jury is more than an instrument of justice and more than one wheel of the constitution: it is the lamp that shows that freedom lives." *Id.* at 156 n. 23, 88 S.Ct. 1444, quoting P. Devlin, *Trial by Jury* 164 (1956). U.S. Const. Amend. VI. The selection of a jury "from a representative cross section of the community is an essential component of the Sixth Amendment." *Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The constitutional right to trial by jury applies when the sentence may include confinement in excess of 6 months. *Baldwin v. New York,* 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970).

A member of the armed forces facing similar criminal punishment in the military justice system does not have the right to trial by jury. A military accused is tried before a panel composed of his or her superiors, not a jury of his or her peers. The panel is not randomly selected, nor does it constitute a representative cross-section of the community. Each member of the panel is selected personally by the commander who convenes the court-martial. Art. 25. The convening authority, who is not a judicial official, exercises command authority and responsibility over the accused, over the members of the panel, and over the discretionary prosecutorial decision to refer the charges to a court-martial. *See, e.g.,* RCM 407 and 503, Manual for Courts–Martial, United States (2000 ed.).

### B

The rationale for providing commanders with the power to select panel members is based on the responsibility and accountability of commanders for the successful conduct of military operations. In the exercise of that responsibility, maintenance of a high state of discipline is necessary to persevere and prevail amidst the danger, death, destruction, and chaos of armed conflict. Congress has determined that the convening authority's command responsibility requires the authority to appoint court members, and the courts repeatedly have sustained this denial of the Sixth Amendment right to trial by jury. *See, e. g., United States v. Smith,* 27 MJ 242, 248 (CMA 1988), citing *Ex Parte Quirin,* 317 U.S. 1, 40, 63 S.Ct. 2, 16, 87 L.Ed. 3 (1942); *Ex Parte Milligan,* 71 U.S. (4 Wall.) 2, 123 (maj. op.), 137–38, 18 L.Ed. 281 (sep. op.) (1866); and *United States v. Kemp,* 22 USC-MA 152, 154, 46 CMR 152, 154 (1973).

### C

From Revolutionary War era Articles of War though World War I, the convening authority exercised virtually unfettered discretion in the selection of commissioned officers senior to an accused for service as panel members. *See* William Winthrop, *Military Law and Precedents* 70–80 (2d ed. 1920 Reprint). When allegations of command abuses led to considerable criticism of the Articles of War in the aftermath of World War I, Congress responded with several reforms, including the establishment of criteria for the selection of panel members. Act of June 4, 1920, ch. II, 41 Stat. 787, 788 (Article of War (AW) 4); H.R.Rep. No. 66–940 at 2–3 (1920). *See* Terry W. Brown, *The Crowder–Ansell Dispute: The Emergence of General Samuel T. Ansell,* 35 Mil. L.Rev. 1, 21–22 (1967).

As revised, AW 4 provided that the commander convening the court-martial "shall detail as members thereof those officers of the command who, in his opinion, are best qualified for the duty by reason of age, training, experience, and judicial temperament." The 1948 Elston Act amended AW 4 to permit enlisted persons to serve on courts-martial. Act of June 24, 1948, ch. 625, tit. II, 62 Stat. 627, 628. The UCMJ, enacted in 1950, made the selection criteria applicable to all the armed forces and added two items—education and length of service. Act of May 5, 1950, ch. 169, § 1, 64 Stat. 108, 116 (Article 25). The present version of this provision states that "[w]hen convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Art. 25(d)(2), 10 USC § 825(d)(2).

## D

Because the selection of the court-martial panel is so intimately bound to the responsibilities of command, military law traditionally has prohibited a commander from delegating the authority and responsibility for detailing court members. *See United States v. Ryan*, 5 MJ 97, 100–101 (CMA 1978). It is noteworthy that when Congress modified the convening authority's responsibilities in the aftermath of *Ryan* and related cases, the legislation did not overturn the prohibition against delegation of the power to detail court-members. *See* S.Rep. No. 98–53, at 12–13 (1983), U.S.Code Cong. & Admin.News 1983, pp. 2177, 2178–79. The amendments were limited in scope, authorizing officials other than the convening authority to detail military judges and counsel, and permitting the convening authority to delegate only the power to excuse panel members. Military Justice Act of 1983, 97 Stat. 1393, 1394 (Arts. 26, 27, and 25). Congressional interest in sustaining the convening authority's personal responsibility for member selection is reflected in the report of the Senate Armed Services Committee, which stated that the Manual for Courts–Martial should "place

reasonable limits on delegation of excusal authority to ensure that the convening authority does not avoid his primary responsibility for the selection of members." S.Rep. No. 98–53, at 13, U.S.Code Cong. & Admin.News 1983, pp. 2177, 2178. *See* RCM 505(c)(1)(B)(ii) ("no more than one-third of the total number of members detailed by the convening authority may be excused by the convening authority's delegate in any one court-martial").

The convening authority's responsibility to exercise personal discretion in the selection of court members does not preclude an appropriate degree of staff assistance in formulating recommendations for panel membership. *See United States v. Marsh*, 21 MJ 445 (CMA 1986), *cert. denied*, 479 U.S. 1016, 107 S.Ct. 666, 93 L.Ed.2d 719 (1986). *Cf. United States v. Kemp*, 22 USCMA 152, 46 CMR 152 (1973). Staff may not present proposals, however, "in such a way that a superior has no practical alternative but to follow their recommendation." *Marsh, supra* at 449.

## E

In response to a recent statutory requirement, the Department of Defense issued a report on the method of selecting court members, including an examination of alternatives such as random selection. Department of Defense, Joint Service Committee on Military Justice, *Report on the Method of Selection of Members of the Armed Forces to Serve on Courts–Martial* (1999) (hereafter "DoD Report"). *See* Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, Pub.L. No. 105–261, § 552, 112 Stat. 1920, 2023 (1998). The report discussed whether a modified form of "random selection" could be implemented in a manner consistent with the convening authority's responsibility personally to select those "best qualified" to serve as panel members. Under such a modified system: (1) the convening authority would establish criteria for identifying those "best qualified" to serve as members; (2) a proposed panel would be randomly selected from among those identified as "best qualified"; and (3) the convening authority would then exercise discretion

as to whether such members should be detailed as panel members. DoD Report at 26–27. Our Court has suggested in *dicta* that such process would comport with Article 25, *United States v. Smith*, 27 MJ 242, 249 (1988), but *Smith* did not involve a random selection procedure, and the DoD Report did not recommend random selection, even in such a modified form.

The DoD Report endorsed the current system of detailing panel members, noting that Article 25 requires the convening authority "personally" to select the court members. DoD Report at 11. The report noted that the convening authority may consider lists forwarded by staff and that, to "ensure that no prospective service members are systematically excluded, convening authorities are advised that they are not limited to the list of nominees forwarded for consideration." *Id.* n. 30. The report observed that the "best qualified" criteria in Article 25(d)(2)—

> ensure[s] the highest caliber personnel [are] available to serve as court-martial members. This represents a significant protection for the accused. Moreover, the "best qualified" court-martial members presumably reach fair and accurate verdicts more efficiently.

*Id.* at 12 (footnote omitted). The report added:

> The fact-finding, sentencing, and judicial roles of court-martial members require a high degree of competence—providing an important protection for the accused service member.

*Id.* n. 33.

With respect to the relationship between staff nominations and convening authority selections, the report noted:

> The current practices used by the Services promote the selection of the best qualified court-martial members. Using subordinate commander nominations enhances the competency of court-martial members by repeated application of the Article 25(d)(2), UCMJ, criteria. First, subordinate commanders, who are in the best position to evaluate their personnel, nominate their most competent and available service members for possible court-

martial duty based upon the Article 25(d)(2), UCMJ, criteria. The convening authority applies the Article 25(d)(2), UCMJ, criteria a second time when selecting court-martial members. An advantage of this process is that it permits the convening authority to rely upon the advice and recommendations of subordinate commanders before applying his or her own judgment and assessment to ensure the best qualified and most competent service members serve on courts-martial.

*Id.* at 18. The report underscored the need for the convening authority to make a personal assessment, rather than rely solely on staff recommendations, because "some subordinate commanders may nominate personnel who are merely most available, rather than most qualified." *Id.*

### F

In sum, the constitutional right to trial by jury does not apply in courts-martial. Congress, however, has been sensitive to the need for fairness in military justice proceedings. In Article 25, Congress has provided members of the armed forces with a valuable protection by requiring the convening authority personally to select those members of the armed forces "best qualified" to serve as court members by reason of judicial temperament and related statutory criteria.

## II. DISCUSSION

In the present case, the Deputy of the Administrative Division, Lieutenant Commander Litsinger, compiled a packet of questionnaires from members of the command that he determined to be reasonably available for court-martial service. He forwarded these nominees to the convening authority through the chief of staff, Captain Sinclair, with the request that Sinclair "select 9 officers from the enclosed candidates to be assigned to YNC Benedict Court–Martial."

Sinclair pared down the list given to him, excluding members who he believed would be unavailable and those who he suspected might be knowledgeable on some level about the case. He gave the shorter list of "six or so" names to his secretary to prepare a final

court-martial convening order, and he then delivered the order to the convening authority for his signature. The convening authority later signed the order without change and without any further inquiry of any sort.

There is no evidence that the convening authority specifically was advised that he could exercise his discretion to add to or subtract from the list of recommended members. *See* DoD report, *supra* at 11 n. 30 ("To ensure that no prospective service members are systematically excluded, convening authorities are advised that they are not limited to the list of nominees forwarded for consideration."). As noted in the majority opinion, when Sinclair was asked at trial whether he would "have substituted anyone if the Admiral had asked to have anyone substituted," he answered, "I don't think I would have without discussing why. If there was any reason why." When asked a similar question a short time later, Sinclair responded, "I would have to hear his arguments for such...."

The record in this case raises a substantial question as to whether the convening authority was handed a *fait accompli* and signed the already-prepared final order without question and without applying the criteria of Article 25. In light of the record, it is inappropriate to rely on the presumption of regularity or any similar presumption as to whether the convening authority, in fact, personally applied the criteria of Article 25 to select those "best qualified" to serve as court members. The issue in this case is not whether the convening authority signed the convening order, but whether he applied the criteria of Article 25 when doing so. As reflected in the majority opinion, the prosecution was determined to avoid presentation of testimony from the one witness—the convening authority—who could have addressed directly the issue of whether the members were selected in accordance with Article 25. *See* 55 MJ at 452. In view of the testimony by the convening authority's subordinates raising a significant question as to whether his action represented a mere fait accompli, the absence of testimony by the convening authority on these matters is inexplicable.

When members of the armed forces are denied a basic constitutional right afforded to their civilian counterparts, it is particularly important they not be deprived of the corresponding right provided by Congress to ensure fundamental fairness. In this case, appellant did not have the right to trial by jury, but he did have the right to be tried before panel members personally selected by the convening authority as "best qualified" by reason of judicial temperament and the related statutory criteria. I would remand this case for a hearing under *United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967), to determine whether the convening authority personally selected the members of the court-martial panel applying the criteria in Article 25.