UNITED STATES

v.

Thomas W. DOWTY, Lieutenant
(O–3), U.S. Navy.

NMCM 9901701.

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 10 Dec. 1998.

Decided 22 Oct. 2002.

LT Travis J. Owens, JAGC, USNR, Appellate Defense Counsel.

LT R.W. Weiland, JAGC, USNR, Appellate Government Counsel.

Before OLIVER, Senior Judge,
VILLEMEZ and HARRIS, Appellate
Military Judges.

OLIVER, Senior Judge:

In a hotly contested trial, the substantive part of which took place during the first 10 days of December 1998, a panel of officer members, sitting as a general court-martial, convicted Appellant of various offenses. These were three specifications of larceny and one specification of fraud against the United States, in violation of Articles 121 and 132, Uniform Code of Military Justice, 10 U.S.C. §§ 921 and 932. The members acquitted Appellant of the remaining charges

and specifications. After hearing additional evidence, the members adjudged a sentence of dismissal from the Naval service and a fine of $30,000. Record at 1083. On 6 July 1999, the convening authority (CA) approved the sentence as adjudged and, except for the dismissal, ordered it executed.

## Prior Appellate History

This case is before us for a third time. In 1997 we ruled on a Government interlocutory appeal under Article 62, UCMJ, 10 U.S.C. § 862. We determined that the relevant provisions of the Right to Privacy Act, 12 U.S.C. § 3419, tolled the running of the 5-year statute of limitations. Art. 43(b)(1), UCMJ, 10 U.S.C. § 843(b)(1). We set aside the military judge's dismissal of Specifications 1, 2, and 3 of Charges I, II, III, and IV, and authorized the court-martial to proceed. *United States v. Dowty,* 46 M.J. 845, 849 (N.M.Ct.Crim.App.1997). After this court denied Appellant's request for reconsideration of its decision, he immediately appealed our decision to the Court of Appeals for the Armed Forces (CAAF). That Court affirmed our determination and returned the record of trial to the Judge Advocate General of the Navy for remand to the military judge for further proceedings. *United States v. Dowty,* 48 M.J. 102, 112, *cert. denied,* 525 U.S. 879, 119 S.Ct. 185, 142 L.Ed.2d 151 (1998).

On 14 September 1998 Appellant filed a Petition for Extraordinary Relief with this court on a different issue. He asked that we reverse the decision of the military judge denying his motion to dismiss under RULES FOR COURTS-MARTIAL 707(b)(3)(C) and 908, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.).[1] Less than a month later we denied his petition. *Dowty v. Rogers,* No. 9601535 (N.M.Ct.Crim.App. 13 Oct 1998)(unpublished op.). Our superior Court subsequently denied Appellant's petition for extraordinary relief and his motion to stay the proceedings. *Dowty v. United States,* 51 M.J. 270, 270 (1998)(summary disposition).

The court-martial then proceeded to trial on the merits.

## Present Posture

During the current appellate review, Appellant has raised two assignments of error, each of which is apparently unique in military jurisprudence. After conducting a careful review of the entire record of trial, these two assignments of error, and the Government's and Appellant's subsequent responses, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

## Claimed Violation of Right to a Speedy Trial

In his first assignment of error, Appellant contends that, by failing to bring him to trial within 120 days of prevailing on its successful appeal to this Court, the Government violated the speedy-trial provisions of R.C.M. 707. We disagree.

This issue was fully litigated at trial. Determining that the 120-day clock began following the decision of the CAAF, the military judge concluded that Appellant was entitled to no relief. Record at 142; *see also* Appellate Exhibit XVII (Ruling on Defense Motion to Dismiss for Violation of R.C.M. 707 of 19 Aug 1998).

## Applicable Legal Principles

The purpose of R.C.M. 707 is not only to protect an accused's constitutional and statutory rights to a speedy trial, *see* U.S. CONST. amends. V and VI; Articles 10 and 33, UCMJ, 10 U.S.C. §§ 810 and 833, but also to "protect[ ] the command and societal interest in the prompt administration of justice." R.C.M. 707, Drafter's Analysis at A21–40.[2] *See United States v. Vogan,* 35 M.J. 32, 33 (C.M.A.1992).

---

1. We cite to the 1995 edition in this opinion because it was the one in effect at the time of Appellant's court-martial. However, we note that all of the operative language in the current version of the Manual is unchanged from the 1995 edition.

2. Because it was predicated on a different standard of review, the 1998 decision of this court and our superior Court to deny Appellant's petition for extraordinary relief does not affect his current assignment of error. *Dowty v. Rogers,* No. 9601535, at 2 n. 1.

Whether Appellant received a speedy trial is a legal question that is reviewed *de novo*. *United States v. Thompson*, 46 M.J. 472, 475 (1997). In such a review, we are to give the military judge's findings of fact "substantial deference" and only reverse them "for clear error." *United States v. Doty*, 51 M.J. 464, 465 (1999); *United States v. Edmond*, 41 M.J. 419, 420 (1995)(quoting *United States v. Taylor*, 487 U.S. 326, 336, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988)).

R.C.M. 707(b)(3)(C), provides that when this court decides a Government appeal, a new 120–day trial clock begins for all charges "neither proceeded on nor severed under R.C.M. 908(b)(4), on the date of notice to the parties under ... 908(c)(3).... After the decision of the Court of Criminal Appeals under R.C.M. 908, if there is a further appeal to the Court of Appeals for the Armed Forces or, subsequently, to the Supreme Court, a new 120–day time period under this rule shall begin on the date the parties are notified of the final decision of the Court of Appeals for the Armed Forces...."

### Discussion

■ Appellant contends that this language is limited solely to *Government appeals* and, if the Government prevails at the Court of Criminal Appeals, it must proceed to trial within 120 days of being notified of the decision, even if, as here, the defense has filed an appeal with the Court of Appeals for the Armed Forces.

Appellant finds some support for this proposition in the language of the Analysis of the applicable rules. That Analysis seems to focus only on government appeals. It provides, in pertinent part: "Subsection (3)(C) clarifies the effect of government appeals on the rule. This subsection treats all government appeals the same." R.C.M. 707, Drafter's Analysis at A21–41. Appellant also argues that the Analysis of R.C.M. 908(c)(3) emphasizes the difference between government and defense appeals by stating: "Note that if the decision of the Court of [Criminal Appeals] permits it (i.e., is favorable to the Government) the court-martial may proceed as to the affected charges and specifications notwithstanding the possibility or pendency of review." R.C.M. Drafter's Analysis at A21–58.

While we follow Appellant's argument, we, like the trial judge, conclude that he is not entitled to any relief. In this case, Appellant and his counsel specifically requested further delay in the processing of his general court-martial on two separate occasions.

First, on 21 August 1996, the military judge discussed with the parties the issue of whether the court-martial should proceed with respect to the four specifications unaffected by the Government appeal under Article 62, UCMJ. All concerned agreed that they wanted to wait until the completion of the appeal process before proceeding. Second, Appellant requested a further delay while he perfected his appeal and until such time as CAAF had time to consider and decide the issues involved.

With regard to the first occasion, the military judge asked the parties: "What is the counsel's desire with regard to those specifications which were unaffected by the ruling of the court and which are not subject to the appeal?" Record at 53. After the trial counsel responded that the Government would prefer to try all the alleged offenses in one proceeding following the appeal, *id.*, the military judge asked the following question of trial counsel: "So is it your desire basically that the court abate the proceedings until the Court of Criminal Appeals rules on this appeal and until any further appeal process as it relates to that issue is completed?" *Id.* at 54. The trial counsel responded affirmatively. *Id.* Trial defense counsel also indicated that they had no objection to proceeding in this fashion. *Id.*

The military judge then emphasized directly to Appellant that such an appeal process could take "five to nine months," possibly longer. "And is it your desire, likewise, to try this entire matter at once and to, thus, await the results of the appeal?" Appellant responded: "Yes, sir." *Id.* The military judge then stated that he would "abate the proceedings until a ruling is forthcoming." *Id.* We consider this to constitute an on-record, judge-approved delay, as the law requires. *See United States v. Carlisle*, 25 M.J. 426, 428 (C.M.A.1988); R.C.M. 707(c).

This is not the "indefinite" abatement of which Appellant now complains, but only a stay until such time as the appellate processing of the issue could be completed.

Of course, the actual appeal process took considerably longer than 5 to 9 months. Such delay is not unusual, especially on complex legal issues. Moreover, Appellant made a second decision, some 22 months later, to file a petition for review of the decision of this court with the CAAF, knowing that this would entail even further substantial delay. By these two choices, Appellant waived going to trial as expeditiously as he otherwise could have.

In ruling on the R.C.M. 707 motion, the military judge acknowledged that the Government could have proceeded to trial following the decision of this court on 19 June 1997 not to reconsider its earlier decision. Even then, however, the court-martial proceedings would have been held in abeyance as soon as the military judge granted another stay or, if he had, for some reason, declined to do so, when CAAF granted the defense request for review and stayed the proceedings below.

This being said, however, we would have preferred to have seen an Article 39(a), UCMJ, session take place within a reasonable time of our final decision in June 1997, summarizing the state-of-play of the case and Appellant's plans to appeal. This would have provided an opportunity to put on the record Appellant's continued desire to delay the trial until his appeal had been decided on the record. The military judge would then have issued a stay specifically granting such a request. Such a hearing would have presented a clearer picture.[3]

Even in the absence of such a hearing, however, it is very clear on the record, both before and following the appeal, that delaying the entire proceeding while awaiting a decision on his appeal, all the way to the Supreme Court, if necessary and possible, was exactly what Appellant wanted to do. Appellant had agreed that he wished to abate the trial proceedings "until the Court of Criminal Appeals rules on this appeal *and until any further appeal process as it relates*

*to that issue is completed."* Record at 54 (emphasis added).

Although located in the paragraph entitled "Government appeals," the military judge noted that the applicable language of R.C.M. 707(b)(3)(C) does not limit itself to government appeals of the decision of the Court of Criminal Appeals. It states: "After the decision of the Court of Criminal Appeals under R.C.M. 908, if there is a further appeal to the Court of Appeals for the Armed Forces . . . a new 120–day time period under this rule shall begin on the date the parties are notified of the final decision of the Court of Appeals for the Armed Forces. . . ." He ruled that there is no practical or logical reason to limit the phrase "a further appeal" to a government appeal of an adverse ruling against it. "[I]t would appear to be an unwise and unwarranted limitation on this rule to apply the new 120 day clock to cases only where the Government pursued its appeal beyond the Court of Criminal Appeals." Appellate Exhibit XVII, Legal Discussion at ¶ 1. We agree.

Likewise, the military judge noted that the specific language of R.C.M. 908(c)(3) provides: "If the decision by the Court of Criminal Appeals permits it, the court-martial may proceed as to the affected charges and specifications pending further review by the Court of Appeals for the Armed Forces or the Supreme Court, unless either court orders the proceedings stayed. Unless the case is reviewed by the Court of Appeals for the Armed Forces, it shall be returned to the military judge . . . ." *Accord,* Appellate Exhibit XVII, Legal Authority at ¶ 2. Like the military judge, we note that the relevant rule states that "the court-martial **may** proceed," not "shall" or "must" proceed. In his written ruling, the military judge noted: "[T]he defense position that . . . [it] should have been forced, either administratively or in court, to request a delay to submit its appeal to the higher court or the Government ran the risk of a speedy trial issue, is somewhat disingenuous." Appellate Exhibit XVII, Legal Discussion at ¶ 2.

---

3. In this respect, we note that this is exactly what the parties did while awaiting the decision of the

Supreme Court whether or not to grant a writ of certiorari.

Finally, to read R.C.M. 707(b)(3)(C) otherwise would defeat the spirit and purpose of the rules regarding speedy trial. In filing an appeal on this issue, the defense is effectively requesting delay and is signaling that the accused now prefers a favorable ruling on his motion over an expeditious trial. To allow the accused a right to appeal without charging him for the delay would allow for gamesmanship and the ability to avoid trial simply by a strategy that calls for delay and penalizes the Government for it under the ironic grounds that he is entitled to a speedy trial. This would be the height of "form over substance."

In the instant case, after losing on the initial appeal by the Government, Appellant first asked this court to reconsider its prior decision. On 20 June 1997, a day after this court indicated that it would not do so, Appellant filed a petition for review of our decision with CAAF. Some 10 weeks later, CAAF granted review of the defense petition. *United States v. Dowty*, 48 M.J. 328 (1997)(order granting review). In view of Appellant's decision to appeal, the case was never returned to the military judge until after the decision by CAAF. By granting this petition for review, CAAF either implicitly stayed the proceedings or, in the alternative, implicitly continued the abatement of the proceedings that the military judge had granted on 21 August 1996. It does not make sense that, after CAAF granted review, either it or the military judge would have thought that the 120–day clock continued to run.[4]

### Conclusion

Therefore, the most recent 120–day speedy-trial clock began on 22 May 1998, the date that the parties were notified of CAAF's final decision. The case then proceeded to trial on 14 July 1998, some 53 days later. The military judge was correct in his determination that there was no violation of R.C.M. 707 on the facts of this case.

### Illegal Member Selection Process

In yet another unique and well developed assignment of error, Appellant contends that in soliciting volunteers to serve as members of his general court-martial and then drafting a list of nominees for the CA's approval, the assistant staff judge advocate (ASJA) violated the letter and spirit of Article 25, UCMJ, 10 U.S.C. § 825, to Appellant's substantial prejudice.

The parties also litigated this issue at trial. After hearing a substantial amount of testimonial and other evidence and arguments, the military judge concluded that "the convening authority made personal selections of the members in this case and that he did so understanding that he could choose from the entirety of his command in the process." Record at 285. While opining that the procedure for developing a proposal for the CA to consider soliciting volunteers was "both novel and potentially troubling," he found that there was no effort to unlawfully deny consideration of a "class of individuals." *Id.* The military judge concluded that the record "clearly indicates" that the CA personally selected the members of the court-martial panel and considered including individuals who were not on the list prepared by the staff judge advocate's office. *Id.* Accordingly, he denied Appellant's motion. *Id.*

### Applicable Legal Principles

While the military accused does not have a 6th Amendment right to a jury selected from among his peers, as in civilian society, *United States v. Lewis*, 46 M.J. 338, 341 (1997), he does have a right to qualified members who are fair and impartial. *United States v. Roland*, 50 M.J. 66, 68 (1999). Congress gave the CA responsibility to select members to serve on courts-martial. *See* Art. 25(d)(2), UCMJ. The CA or his staff may not "skew" the process to select members solely on the basis of rank. *United States v. Nixon*, 33 M.J. 433, 434 (C.M.A.1991)(with the "sole

---

4. In his ruling, the military judge wrote: "[E]ven if the defense construction of the two rules of courts-martial stated above is correct, the speedy trial clock which began with the denial of the defense motion for reconsideration of the Court of Criminal Appeals decision on 19 June 1997 concluded not later than 10 September 1997 when the Court of Appeals for the Armed Forces granted the defense request for review.... Hence, *at the very most*, Government accountability for speedy trial purposes ... [was] a period of 83 days." Appellate Exhibit XVII, Legal Discussion at ¶ 3.

exception" that members should be senior to the accused, *id.* at 435, *see* Art. 25(d)(1), UCMJ). Nor may a court-martial be " 'packed' to achieve a desired result." *United States v. White*, 48 M.J. 251, 254 (1998)(quoting *United States v. Hilow*, 32 M.J. 439, 440 (C.M.A.1991)). "Court packing may occur if a subordinate packs the list of nominees presented to the convening authority." *White*, 48 M.J. at 254. Military appellate courts must be "especially concerned to avoid either the appearance or reality of improper selection." *United States v. McClain*, 22 M.J. 124, 132 (C.M.A.1986).

"Whether a court-martial panel was selected free from systematic exclusion is a question of law which we review *de novo.*" *United States v. Kirkland*, 53 M.J. 22, 24 (2000). We are bound by the military judge's findings of fact unless they are "clearly erroneous." *United States v. Benedict*, 55 M.J. 451, 454 (2001). "The defense shoulders the burden of establishing the improper exclusion of qualified personnel from the selection process." *Kirkland*, 53 M.J. at 24 (citing *Roland*, 50 M.J. at 69). "Once the defense establishes such exclusion, the Government must show by competent evidence that no impropriety occurred when selecting appellant's court-martial members." *Kirkland*, 53 M.J. at 24; *see also Roland*, 50 M.J. at 69.

A "convening authority's power to appoint a court-martial is one accompanying the position of command and may not be delegated." *United States v. Ryan*, 5 M.J. 97, 100 (C.M.A.1978). Article 25(d)(2), UCMJ, directs that the CA must personally select the court-martial members who "in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." *Accord*, R.C.M. 502(a)(1). The CA may have assistance from his staff or subordinate commanders, but "such a procedure amounts to no more than a preliminary screening of available members for the information of the convening authority. Under the provisions of Article 25, the responsibility and duty of selecting those best qualified for service under the standards set forth in the article

remain with [the convening authority]." *United States v. Kemp*, 22 C.M.A. 152, 155, 46 C.M.R. 152, 155, 1973 WL 14469 (1973).

■ "The selection process normally starts with the SJA seeking nominations from subordinate jurisdictions. Presenting nominations to a convening authority is a reasonable means of assisting the convening authority, provided it does not improperly exclude eligible service members." *Roland*, 50 M.J. at 69; *accord Kemp*, 22 C.M.A. at 155, 46 C.M.R. at 155; *see also* Dep't Of Defense Joint Service Committee on Military Justice (1999), *Report on the Method of Selection of Members of the Armed Forces to Serve on Courts–Martial* [hereinafter DoD Report]. "Subordinate commanders, who are in the best position to evaluate their personnel, nominate their most competent and available service members based on the Article 25(d)(2), UCMJ, criteria." Appellant's Brief of 24 Aug 2001 at 11 (quoting DoD Report at 10); *see also United States v. Marsh*, 21 M.J. 445, 449 (C.M.A.1986); *United States v. Daigle*, 1 M.J. 139, 141 (C.M.A. 1975). "This nomination process may not systematically exclude or include a certain category of servicemembers." *Roland*, 50 M.J. at 69. A subordinate's improper selection of a member pool may taint the CA's selection, even if the convening authority has no knowledge of the impropriety. *Hilow*, 32 M.J. at 440 (holding that a member-nomination process "orchestrated" to select personnel with severe views on military justice violated Articles 25 and 37, UCMJ, despite the CA's personal lack of knowledge).

### Applicable Facts

In his efforts to create a pool for Appellant's upcoming court-martial, the ASJA for the Bureau of Medicine and Surgery (BUMED), hit upon the "novel approach" of soliciting volunteer members by running the following notice in the BUMED Plan of the Week: [5]

3. LEGAL NOTE: MEMBERS NEEDED. Would you like to serve as a member in a general or special courts-

---

5. The process was not only "novel" based on the ASJA's experience. Our research uncovered no appellate cases discussing the selection of court-members after soliciting volunteers in this way.

martial in the greater Washington, DC area? Interested active-duty military personnel, both officers and enlisted, please contact the [ASJA], JAGC, USN, at 762–3087 for further information.

Record at 236–37, 239; Appellate Exhibit XXXIII, Enclosure (Plan of the Week). The BUMED SJA approved the use of this advertisement. He then gave the ASJA "the responsibility for putting together this member pool." Record at 267.

Out of approximately 140 officers in BUMED, 50 or so officers and enlisted personnel responded to the solicitation. *Id.* at 241, 246. The ASJA provided the interested volunteers with members' questionnaires. *Id.* at 241–43. He received back 47 completed questionnaires. *Id.* at 241. He separated out the enlisted volunteers, leaving him with 22 officer volunteers. *Id.* at 243. The ASJA contacted 21 of the 22 officers who volunteered. *Id.* He testified that he deleted two volunteers from the nominee pool due to "concerns" he had "because of their close relationship with legal" and that it would be therefore unfair for them to sit on the jury. *Id.* at 245.

The ASJA contacted the remaining 20 volunteers and, without providing any details, such as the name of the accused or the amount of time the volunteers might be required, asked each of them if they would be "available" to serve on a court-martial during the first week of December 1998. *Id.* at 243. The ASJA rejected another five volunteers because they said they were not "available." *Id.* at 243–44. Thus, the ASJA "combed" down the 140 member officer pool at BUMED to 15 qualified and available volunteers. *Id.* at 244. From these 15, the ASJA nominated nine officers that he believed were best qualified to serve as members on Appellant's court-martial. *Id.* at 246.

Until the ASJA decided to utilize his volunteer-nomination process, the "standard procedure for selecting members" at BUMED was for department heads to nominate the best qualified officers from their respective departments. *Id.* at 264–65. Naval District Washington followed this subordinate-commander nomination model as well. *Id.* at 272. In fact, the ASJA admitted that he had followed this traditional nomination model at his prior command. *Id.* at 237.

Without an explanation of the "novel" nature of his selection method, the ASJA forwarded, via the Chief of Staff, a list of 15 nominees and their members' questionnaires to the CA, Chief, Bureau of Medicine and Surgery (BUMED). *Id.* at 255 and 268.[6] Along with the nominee list, the ASJA forwarded a checklist of his own selections and all the member questionnaires. *Id.* at 255–56. The package also contained the following guidance:

> As convening authority, you must select personnel qualified by age, training, length of service, and judicial temperament; the attached court-martial questionnaires for each candidate may be useful in making this determination. I believe that any of the candidates listed below are acceptable. Please select up to nine individuals from the list by initialing each of your choices. If you believe that other officers should be selected, MED–OOL will solicit additional members from throughout the command.

Appellate Exhibit XXXIII, exhibits 1 and 2.[7] The CA adopted eight of the ASJA's nine personal choices for service on the court-martial, choosing another officer (who was not among the original group of volunteers) to bring the total to nine. *Id.* at 256. He made a check mark opposite each of the officers he had selected and then signed the form. *Id.;* Appellate Exhibit XXXIII at exhibit 2. Subsequently this list of nine officers appeared on the convening order, which the CA also signed. General Court–Martial Amending Order 1B–96 of 22 Oct 98.

Just before trial there was yet another amendment to the convening authority. General Court–Martial Amending Order 1C–96 of 25 Nov 98. This added four new

---

6. Without discussing the ASJA's nine selections, the SJA "just looked at" the selections and the nominee list and told his ASJA that "it's ready, you can take it forward." *Id.* at 268.

7. This guidance did not include the other statutory criteria: "experience." *See* Art. 25(d)(2), UCMJ.

officers (none of whom were volunteers) and deleted the two lieutenants, each of whom, it turned out, were junior to Appellant and regarding whom the military judge had raised concerns. Record at 281.[8] By the time the *voir dire* and challenge processes were completed, only two "volunteers" ended up sitting among the seven members of the panel at Appellant's court-martial.

## Discussion

 Appellant contended during his motion at trial and now argues on appeal that this process, by relying on volunteers, improperly excluded from consideration a certain category of otherwise eligible servicemembers, that is, non-volunteers. He contends that volunteers may well have brought their own agenda to the court-martial and, by self-selecting themselves, they may not have been the best qualified under the criteria contained in Article 25, UCMJ.

Appellant also contends that this volunteer-recruitment process short-circuited the normal subordinate-commander-nomination model and put the initial decision-making process in the hand of a junior officer with little consideration of the Article 25, UCMJ, criteria. Moreover, he argues that the CA was never informed of this "aberrant" method of developing nominees.

Finally, Appellant contends that the ASJA was predisposed toward the Government and that he was therefore biased, from either an objective or subjective standard, in putting together the member pool. For these three reasons he now argues that the court-martial was not properly convened. He asks that this court reverse the findings and dismiss all the charges.

While each of these raises some concerns in our minds, we are confident that the military judge, after hearing evidence and argument on the motion, ruled correctly that the members who sat on Appellant's panel were fair and impartial and personally selected by the CA based on appropriate statutory criteria.

To develop a pool of the best qualified court-martial members in their command, CA's, particularly ones with pressing responsibilities comparable to BUMED's, who was then serving as the Navy's Surgeon General, rely heavily on subordinates in staffing the process necessary to develop courts-martial members consistent with Article 25, UCMJ. This is quite proper. *Roland,* 50 M.J. at 69; *Marsh,* 21 M.J. at 449; *Kemp,* 22 C.M.A. at 156, 46 C.M.R. at 156; *United States v. Rice,* 3 M.J. 1094, 1098 (N.C.M.R.1977). The important thing is that the CA make the actual selections based on the statutory criteria. *Benedict,* 55 M.J. at 454–55. The ASJA applied most of the Article 25(d)(2), UCMJ, standards in nominating the 15 members and recommending nine members to the CA. Record at 247–51. Then BUMED, the CA, personally made the selections.

Of course, Appellant is quite correct that the vetting process used in this case did not follow the subordinate-commander-nomination model espoused by the DoD Report. Although in his brief Appellant relies heavily on this DoD Report, neither statute nor case law mandates this model (or any other). *But see Benedict,* 55 M.J. at 457–58 (Effron, J., dissenting). There was no effort to exclude any particular group of potential members. Representative members of both sexes and all ranks senior to Appellant (except for flag officers) were nominated and chosen to sit on Appellant's panel. Just as did the military judge, we reject Appellant's argument that non-volunteers are a discrete group that cannot be excluded without violating his substantial rights. The import of Article 25, UCMJ, is that the CA must personally select members whom he believes are experienced and will serve impartially and fairly in fulfilling their responsibilities as members. That is what took place on this occasion. The CA personally selected all seven members of the panel who eventually sat on Appellant's case.

Indeed, by the time the court was assembled following the *voir dire* and challenge process, the seven-member panel who actually sat in judgment of Appellant consisted of

---

8. The "sole exception" to the rule that the convening authority and SJA not use military grade as a test for membership is that it is appropriate

to "assur[e] that court members outrank the accused, *see* Art. 25(d)(1)." *Nixon,* 33 M.J. at 435.

only two "volunteers," CAPT Higgins, USN, and LCDR Rahal, USN. *See* Record at 360, 438. Each of them denied ever having volunteered for any particular case. *Id.* at 383 (Higgins); 429 (Rahal). The other five members were those BUMED had chosen from other officers assigned to his command based on the Article 25, UCMJ, criteria. While it would have been better had the ASJA (or SJA or Chief of Staff) notified the CA of the "novel" procedure by which the ASJA developed the original list of nominees, this is not a statutory requirement. Unlike in *Hilow*, where there was a blatant attempt to "stack" the deck against the accused, *see* 32 M.J. at 440, in the instant case the command representatives all made a good-faith effort to develop a highly qualified, fair, and impartial panel.

Finally, Appellant contends that the ASJA had a pre-Government bent and, in fact, assisted the Government significantly in strengthening its evidentiary case against him. Command SJA's are often, quite properly called upon to assist the Government in investigations. *See United States v. Willis*, 22 C.M.A. 112, 114, 46 C.M.R. 112, 114, 1973 WL 14460 (1973). This does not disqualify the SJA from performing his responsibility of "advising the convening authority." *Id.* However, an SJA "may become so deeply and personally involved as to move from the role of adviser to the role of participant. Once he acts in that capacity, he is disqualified from later performing any inconsistent function." *Id. See also United States v. Gutierrez*, 57 M.J. 148 (2002).

Based on the testimony of the ASJA and others, there is no indication that he became an "active participant" in the investigation of Appellant. Moreover, the evidence establishes that he performed his staff function of helping to develop a list of potential members with no other purpose in mind than to help the convening authority comply with his responsibilities under Article 25, UCMJ, and to move the process forward. There was no improper involvement such as to disqualify the ASJA from the member-selection process.[9]

As yet another assurance that Appellant was not prejudiced, we, like the military judge, have reviewed the comprehensive *voir dire* process carefully.[10] Appellant and his counsel were given full opportunity to question potential members in open court to develop any possible biases or preconceptions and, through appropriate causal and peremptory challenges, remove any potential member who they had reason to believe would not be capable, fair, and impartial. Record at 360–436. We support the military judge's determination that such was the makeup of the panel who heard Appellant's court-martial.

## Conclusion

■ While we agree with the military judge that the jury-selection process used in this case was "potentially troubling," [11] we are confident that there was no material prejudice to Appellant's substantial rights. The CA personally selected all of the members based on the proper statutory criteria. In addition, he was both advised that he could consider, and actually did consider and select, potential members who were outside the scope of the volunteer pool. The court was properly convened. Moreover, Appellant received the statutorily qualified, fair, and impartial panel to which he was entitled.

## Decision

Accordingly, we affirm the findings and the sentence, as approved on review below.

---

9. We note that the ASJA, who testified at trial on the Article 25, UCMJ, motion, was not involved in preparing the post-trial advice to the CA. SJAR of 26 May 99. Had he been so, this would have been a violation of at least the spirit of R.C.M. 1106(b). R.C.M. 1106(b), Discussion. *See United States v. Sorrell*, 47 M.J. 432, 434 (1998).

10. During the *voir dire* process the parties and the military judge specifically addressed the issue of whether or not the members had volunteered for the court-martial and whether they had any

agenda for doing so. Of course, the military judge presided over the *voir dire* process **after** he had ruled on this motion. However, we are confident that he was sensitized to the possibility of volunteers bringing into the court-martial process an agenda that officers chosen in a less "novel" process might not have had.

11. In this regard we would prefer to see the subordinate-commander-nomination process used as the best method of developing a list of potential court-martial members.

Judge VILLEMEZ and Judge HARRIS concur.