IN THE CASE OF


UNITED STATES, Appellee

v.

Thomas W. DOWTY, Lieutenant
U.S. Navy, Appellant

No. 03-0152

Crim. App. No. 9901701

United States Court of Appeals for the Armed Forces

Argued October 8, 2003

Decided August 18, 2004

GIERKE, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., BAKER, and ERDMANN, JJ., joined. EFFRON, J.,
filed a separate dissenting opinion.

Counsel

For Appellant: Lieutenant Marcus N. Fulton, JAGC, USN (argued).

For Appellee: Captain Glen R. Hines, Jr., USMC, (argued);
Colonel R. M. Favors, USMC, Commander Robert P. Taishoff, JAGC,
USN, and Lieutenant Ross W. Weiland, JAGC, USNR (on brief).

For Amicus Curiae: Kevin J. Barry, Esq. (argued); Philip D.
Cave, Esq., Eugene R. Fidell, Esq., and Stephen A. Saltzburg,
Esq. (on brief), for the National Institute of Military Justice.

Military Judge: R. L. Rodgers

**This opinion is subject to editorial correction before final publication**.

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of three specifications of larceny and one specification of fraud against the United States in violation of Articles 121 and 132, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 921 and 932 (2000), respectively. The adjudged and approved sentence provides for Appellant to pay a $30,000.00 fine and to be dismissed from the naval service. The Court of Criminal Appeals affirmed the findings and sentence. United States v. Dowty, 57 M.J. 707 (N-M. Ct. Crim. App. 2002).

This Court granted review of the following issue:

WHETHER APPELLANT'S COURT-MARTIAL WAS PROPERLY CONVENED WHERE THE MEMBERS POOL WAS CREATED THROUGH SELF-SELECTION AND NO MEMBERS WERE SELECTED BY THE CONVENING AUTHORITY ACCORDING TO THE CRITERIA CONTAINED IN ARTICLE 25, UNIFORM CODE OF MILITARY JUSTICE.

The lower court properly characterized this issue as "unique in military jurisprudence." Id. at 708. Appellant's command initially used only volunteers for the court-marital panel. The granted issue asks this Court to evaluate a novel preliminary screening process that generated the volunteers for the court-martial panel and to examine the legal advice provided to the convening authority (CA) as he selected the panel. For the reasons set forth below, we conclude that (1) it was error

2

to inject into the panel selection process the irrelevant variable of a servicemember volunteering to be a member and (2) although we reject and condemn the impermissible screening of potential members with this irrelevant variable, here it did not taint the proceedings or prejudice Appellant.  We, therefore, affirm the decision of the Court of Criminal Appeals.

## I. FACTS

### A. General background of Appellant's offenses and the extended delay of the trial on the merits

We outlined the general nature of the charges that Appellant now stands convicted of when his case was before us in 1998 on an interlocutory appeal.

> While serving on active duty in the Medical Service Corps of the Navy, appellant allegedly conducted a private business named Health Care Associates, under which he submitted claims for reimbursement to the National Naval Medical Center at Bethesda, Maryland.  The charges in this case allege that the claims submitted by appellant were fraudulent.

> On September 28, 1993, the Defense Fraud, Waste, and Abuse Hotline received an anonymous allegation that claims submitted by appellant's company to the Government between 1989 and 1992 were false and forged; that such claims had resulted in payment by the Government of $15,000 for services that appellant's company never had rendered; and that appellant had deposited the checks paid by the Government for these fraudulent claims into his personal checking account.  The caller subsequently was identified as appellant's former wife.

> . . . .

> [Eventually t]he charges were referred to general court-martial.

3

United States v. Dowty, 48 M.J. 102, 104-05 (C.A.A.F. 1998).

The case was hotly contested from the outset with extensive interlocutory litigation at the lower court, in United States District Court, and at this Court. The lower court's opinion documents the prior appellate history. 57 M.J. at 708. This extended appellate litigation resulted in postponing the trial on the merits. While this case began on May 9, 1996, the substantive trial on the merits was delayed until early December 1998. This delay was problematic with regard to providing panel members for the court-martial. In the original convening order and first modification, the CA had detailed ten members to the court-martial. Because many of both the original and substituted panel members had been transferred, new panel members were needed.

### B. The novel panel selection process

The genesis of the present issue is in a routine task frequently facing the command staff judge advocate - how to identify a pool of members from which the CA will select the court-martial panel. Before 1998, the "standard procedure for selecting members" at the Bureau of Medicine and Surgery (BUMED) was for department heads to nominate the best qualified officers from their respective departments. This is similar to the accepted and traditional subordinate-commander nomination model that is frequently followed.

4

In the summer of 1998 as Appellant's trial was to continue on the merits, the Assistant Staff Judge Advocate (ASJA) of BUMED in his own words "came up with the idea of publishing a Plan of the Week notice" requesting volunteers to serve as court-martial members. He took this admittedly "novel approach" because the BUMED command "had a severe need for a members pool." His concern was to obtain members for Appellant's case and potentially three other cases in the next several months.

With the approval of the Staff Judge Advocate (SJA) and other military supervisors, the ASJA presented the following announcement in the BUMED Plan of the Week for four days, June 20-23, 1998:

> 3. LEGAL NOTE: MEMBERS NEEDED. Would you like to serve as a member in a general or special courts-martial in the greater Washington, DC area? Interested active-duty military personnel, both officers and enlisted, please contact [the ASJA] . . . for further information.

The record does not address whether the CA had actual knowledge of this solicitation for volunteer members, but it does establish that he did not assume command until June 28, 1998, several days after the announcement in the BUMED Plan of the Week.

The lower court's opinion reports the chain of events that followed:

> Out of approximately 140 officers in BUMED, 50 or so officers and enlisted personnel responded to the solicitation. The ASJA provided the interested volunteers with members' questionnaires. He received back 47

completed questionnaires. He separated out the enlisted volunteers, leaving him with 22 officer volunteers. The ASJA contacted 21 of the 22 officers who volunteered. He testified that he deleted two volunteers from the nominee pool due to "concerns" he had "because of their close relationship with legal" and that it would be therefore unfair for them to sit on the jury.

The ASJA contacted the remaining 20 volunteers and, without providing any details, such as the name of the accused or the amount of time the volunteers might be required, asked each of them if they would be "available" to serve on a court-martial during the first week of December 1998. The ASJA rejected another five volunteers because they said they were not "available." Thus, the ASJA "combed" down the 140 member officer pool at BUMED to 15 qualified and available volunteers. From these 15, the ASJA nominated nine officers that he believed were best qualified to serve as members on Appellant's court-martial.

57 M.J. at 713 (footnotes and citations omitted).

## C. The advice the CA received as he selected the panel

After the ASJA had compiled a list of qualified and nominated members, he submitted it to the SJA for his review and finally to the chief of staff who approved it. The ASJA then forwarded this list of 15 qualified members and 9 nominated members to the CA. The folder of information submitted to the CA included the following:

1) The Court Member Questionnaire for each of the 15 nominated members;

2) Two separate documents with each member's name and a blank space to the left. On one of these documents the ASJA indicated by a check mark his nine nominees for the

6

panel.  The other document was substantially a mirror image of the first except the blank space to the left of every name was not marked; on this document the CA was to indicate by his check mark his personal selection of the panel members; and

3)  Written advice to the CA regarding his personally selecting the members.

This written advice contained this guidance:

> As convening authority, you must select personnel qualified by age, training, length of service, and judicial temperament; the attached court-martial questionnaires for each candidate may be useful in making this determination.  I believe that any of the candidates listed below are acceptable.  Please select up to nine individuals from the list by initialing each of your choices.  If you believe that other officers should be selected, MED-OOL will solicit additional members from throughout the command.

The AJSA did not personally brief or discuss further with the CA the selection of the members.  Specifically, the ASJA did not disclose to the CA that he used a "novel" method to select potential members, that the list of nominated members consisted solely of volunteers, or that non-volunteers were specifically excluded from the pool of potential members.

In selecting the members, the CA signed his name at the bottom of the page to indicate his selection of nine members.  That document also has a check mark opposite each of the officers he selected.  Eight of the individuals selected by the CA were individuals that the ASJA had personally recommended.

7

Although part of the pool of fifteen qualified members, the ninth individual selected by the CA for the panel was not personally recommended by the ASJA. The ninth member selected by the CA was also among the original group of volunteers. Eventually, the CA signed a convening order amendment that contained this list of nine officers. Two of the officers selected as members were lieutenants junior in rank to Appellant.

At this point, the panel was not set in stone, and there was another convening order amendment that added four new officer members. None of these new panel members were volunteers who responded to the Plan of the Week announcement. This amendment also deleted the two volunteer members who were junior in rank to Appellant. As the trial began seven volunteers remained on the panel.

### D. Trial developments related to challenging the members selection process

At trial the defense moved to strike the panel currently detailed and to stay the proceedings on the basis that the members detailed were improperly selected. The focus of Appellant's argument was that the systematic exclusion of non-volunteers was impermissible court "packing." Appellant asserted that the CA failed to perform his statutory duty under Article 25, UCMJ, of personally selecting the members because the ASJA limited the CA's pool of members to volunteers and did

not inform the CA of his developing the panel pool on this basis. Appellant asserted that the ASJA's limiting the panel pool to volunteers impermissibly allowed the members to "choose themselves," allowed volunteers to possibly bring an agenda to the court-martial, and excluded otherwise qualified non-volunteer members.

In support of his position, Appellant filed with the Court a 14 page Motion For Appropriate Relief with detailed factual statements and 19 Exhibits that included all the documents that were submitted to the CA. In Appellate Exhibit XXXIII, the defense presented factual information that the defense had obtained through interviews of three witnesses including the CA, SJA, and ASJA. In the motion, the defense requested the Court to consider both the "statement of facts presented herein which will be supported by the testimony of [the SJA, ASJA, and CA]" and the 19 exhibits. Responding to this request at the outset of litigating this motion, the judge ruled, without objection from the parties, that he would consider Appellate Exhibit XXXIII and the attachments in ruling on the motion. The judge then afforded the defense the opportunity to present "other evidence."

While the defense did call witnesses including the SJA and ASJA, neither the defense nor the prosecution called the CA to testify. However, the CA's information regarding his selection

of the panel was already before the judge in the detailed defense factual summary that the judge had previously ruled he would consider in ruling on the defense motion. In its motion, the defense established that the CA had stated "that despite receiving a file [that included the list of nine members recommended by the ASJA], he did not review the submitted list from the [ASJA], and instead . . . relied solely upon the 15 members (sic) questionnaires in making his decision." The defense also represented that:

> [the CA] explained that one of the two members lists which have been produced in this matter was marked by him as to those members which he chose. It bears his signature and is attached hereto as Exhibit 2. He received the recommendation list, Exhibit 1, but he did know who had prepared it, nor did he review it until after he had made his choices. When he received the package related to this panel, he reviewed the member questionnaires presented to him thoroughly. He does not recall speaking to anyone about this panel.

In denying the defense motion, the military judge stated in part,

> [I]n your own evidence you've both raised the issue and defeated it. I think that the evidence indicates that the convening authority made personal selections of the members in this case and that he did so understanding that he could choose from the entirety of his command in the process. The technique which was employed in soliciting volunteers, both novel and potentially troubling . . . has been overcome by the evidence that clearly indicates . . . both personal selection of the members and consideration of the individuals who went beyond this list.

When the court-martial was assembled, there were ten members, six of whom were "volunteers." The CA had excused one

10

"volunteer" for an unexplained reason.  When the trial proceeded to voir dire, the military judge revisited the issue of members volunteering by asking the entire panel, "Did any of you volunteer to serve as a member at a court-martial?"  Three of the six original volunteers gave an affirmative response.  They all stated that they did not know this would be the case they would be sitting on when they volunteered.  Also the judge inquired of each member his reason for volunteering.  One member stated simply, "Sir, it was an opportunity to take part in a unique aspect of the justice system in the military.  I've always wanted to do that."  The other members stated they just wanted to provide help where it was needed or "just offered."  We also note that in voir dire one member, who was not among the original 15 nominated volunteers and was later added to the panel in an amendment to the convening order, disclosed that she volunteered for reasons unrelated to the solicitation for court members in the Plan of the Week.  She explained that she had volunteered "for the experience" of court-martial participation.

During individual voir dire, civilian defense counsel questioned the other three members who did not indicate that they volunteered.  One member did not recall volunteering, another did not remember the request for members in the Plan of the Week, and the final member stated that he did not understand the earlier question and admitted that he was also a volunteer.

Group or individual voir dire also established that the four new panel members were not volunteers.

With this information, the defense counsel did not challenge any member because the member volunteered for service on the panel. The judge granted one defense causal challenge to a volunteer member on grounds that had nothing to do with the member's status as a volunteer. The judge also granted one peremptory challenge made by the prosecution and one made by the defense, thereby removing two more "volunteers" from the panel. As the case began on the merits, only three volunteer members who responded to the Plan of the Week solicitation were on the seven member panel.

### E. Appellate challenge related to the members selection process

At the lower court, Appellant repeated the challenge to the panel selection that he originally presented to the military judge, but the lower court rejected his arguments. We note that the lower court opinion incorrectly states only two volunteers actually served on the panel when, in fact, there were three. 57 M.J. at 715. But this factual error does not otherwise affect the lower court's analysis or conclusions. Although the lower court agreed with the military judge that the panel selection process was "potentially troubling," it found that "[t]here was no effort to exclude any particular group of

potential members." Id. at 714-15. Expressly rejecting Appellant's argument that non-volunteers are a discrete group that cannot be excluded without violating Appellant's Article 25, UCMJ rights, the lower court found that the CA personally selected the members. Id. at 714.

Before this Court, Appellant again asserts a violation of Article 25, UCMJ in the ASJA's method of soliciting volunteers to select a members pool and repeats his trial and prior appellate arguments. However, for the first time, Appellant expands his attack on the members selection process by arguing that the CA did not select members for Appellant's court-martial based on the explicit statutory requirements of Article 25(d)(2), UCMJ. Appellant asserts that the ASJA advised the CA of only four of the Article 25(d)(2) requirements for selecting members: age, training, length of service, and judicial temperament. Appellant claims the ASJA did not advise the CA of the statutory requirements of "experience" and "education," thereby preventing a properly informed CA from selecting the members.

The Government asserts that the CA complied with Article 25(d)(2), UCMJ, and properly detailed members to Appellant's court-martial. The Government asserts that the nomination procedure here was a permissible preliminary screening of

13

available members. The Government also asserts that there was no evidence that the CA did not personally select the members.

## II. DISCUSSION

### A. Evaluation of the novel panel selection process

Article I, Section 8, Clause 14, of the United States Constitution empowers the Congress "To make Rules for the Government and Regulation of the land and naval Forces[.]" Legislating under the authority of this provision, Congress has established the court-martial as the institution to provide military justice to servicemembers. This Court has stated that "the Sixth Amendment right to trial by jury with accompanying considerations of constitutional means by which juries may be selected has no application to the appointment of members of courts-martial." United States v. Kemp, 22 C.M.A. 152, 154, 46 C.M.R. 152, 154 (1973). A servicemember has no right to have a court-martial be a jury of peers, a representative cross-section of the community, or randomly chosen. Ex parte Quirin, 317 U.S. 1, 39-41 (1942); United States v. Tulloch, 47 M.J. 283, 285 (C.A.A.F. 1997); United States v. Smith, 27 M.J. 242, 248 (C.M.A. 1988). "But, the military defendant does have a right to members who are fair and impartial." United States v. Roland, 50 M.J. 66, 68 (C.A.A.F. 1999). This right "is the cornerstone of the military justice system." United States v. Hilow, 32 M.J. 439, 442 (C.M.A. 1991).

14

Actual appointment of fair and impartial members is the duty and responsibility of the CA. A "convening authority's power to appoint a court-martial is one accompanying the position of command and may not be delegated." United States v. Ryan, 5 M.J. 97, 100 (C.M.A. 1978). Regarding this non-delegable duty of the CA, Article 25(d)(2) provides:

> When convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament. No member of an armed force is eligible to serve as a member of a general or special court-martial when he is the accuser or a witness for the prosecution or has acted as investigating officer or as counsel in the same case.

Simply stated, this statute mandates the selection of members who are "best qualified." See United States v. White, 48 M.J. 251, 254 (C.A.A.F. 1998). It is blackletter law that the CA must personally select the court-martial members. See United States v. Allen, 5 C.M.A. 626, 18 C.M.R. 250 (1955). However, we have also stated that this is not the CA's solitary endeavor:

> [W]e have recognized that the convening authority, while charged with the personal responsibility for the selection of court members, must have assistance in the preparation of a panel from which to choose those members. In order to carry out his function under Article 25, he must necessarily rely on his staff or subordinate commanders for the compilation of some eligible names.

Kemp, 22 C.M.A. at 155, 46 C.M.R. at 155; see also United States v. Benedict, 55 M.J. 451, 455 (C.A.A.F. 2001)("This Court has held in the past that the 'convening authority may rely on his

15

[or her] staff to nominate court members.'")).  Senior Judge Cox gave wise advice for everyone involved in providing court-martial members:

> Those responsible for nominating court members should reflect upon the importance of this task.  It is a solemn and awesome responsibility and not one to be taken lightly or frivolously. . . .  A fair and impartial court-martial is the most fundamental protection that an accused servicemember has from unfounded or unprovable charges.  There is a duty to nominate only fair and impartial members.

Smith, 27 M.J. at 252 (Cox, J., concurring).

In a long line of cases, we have addressed the role of subordinates, often the staff judge advocate, in performing a preliminarily screening of members.  In so doing, this Court has repeatedly declared its vigilance in guaranteeing the judicial integrity of a court-martial and in preventing improper selection of court members.  See Roland, 50 M.J. at 68; Hilow, 32 M.J. at 442.

Several cases provide guidance as to what cannot be done in screening members for the CA's consideration of appointment to a court-martial.  In United State v. Daigle, 1 M.J. 139 (C.M.A. 1975) we rejected a staff judge advocate's process to obtain nominees from subordinate commanders solely on the basis of their rank and without consideration of the Article 25(b)(2), UCMJ criteria.  See also United States v. Kirkland, 53 M.J. 22 (C.A.A.F. 2000)(holding that exclusion of potentially qualified members below the grade of E-7 was improper); cf. United States

v. Yager, 7 M.J. 171, 173 (C.M.A. 1979)(permitting exclusion of soldiers in pay grades E-1 and E-2 as presumptively unqualified under Article 25(d)).  In Hilow, we held that the deliberate stacking of the pool of potential members was improper.  32 M.J. at 442.  We found it impermissible for the division deputy adjutant general to submit nominees to the staff judge advocate who were supporters of a command policy of hard discipline.  Id. at 440 (court packing may occur if a subordinate packs the list of nominees presented to the convening authority); see also United States v. McClain, 22 M.J. 124 (C.M.A. 1986)(rejecting systematic exclusion of junior officers and enlisted members in pay grade E-6 and below to avoid light sentences).

Other cases are illustrative as to what subordinates can do in generating a pool of potential court-marital members to be submitted to the CA.  In Kemp, 22 C.M.A. 152, 46 C.M.R. 152, we approved the initial compiling of the pool of potential nominees by random selection from the master personnel file.  See also United States v. Crawford, 15 C.M.A. 31, 35 C.M.R. 3, 7 (1964)(approving selection of members following a random selection of a prospective member list).  In United States v. Pearson, 15 C.M.A. 63, 35 C.M.R. 35 (1964), this Court found nothing to cast doubt on the propriety of a selection process that preliminarily screened enlisted court members senior in grade to the accused as this limitation is required by Article

17

25, UCMJ. In White, this Court permitted group commanders to submit nominees who were the "best and the brightest" officers, thereby ultimately satisfying the CA's personal desire for more commanders and their deputies rather than non-commanders on the court-martial panel. 48 M.J. at 253.

Importantly in White, this Court reaffirmed the importance of inclusion in identifying panel members.

> Thus, a convening authority 'is free to require representativeness in his court-martial panels and to insist that no important segment of the military community - such as blacks, Hispanics, or women - be excluded from service on court-martial panels,' so long as he or she does not systemically exclude a class or group of qualified candidates from court-martial membership.

Id. at 254 (quoting Smith, 27 M.J. at 249). See also Crawford, 15 C.M.A. at 31, 35 C.M.R. at 3 (stating that deliberate selection of minority was proper inclusion to insure fair representation). However, a desire for representativeness cannot be a subterfuge to pack the panel. See Smith, 27 M.J. 242 (rejecting the selection of female members to help secure a particular outcome).

From these cases, we identify three factors that are most helpful in evaluating the propriety of any screening of servicemembers for eventual consideration by the CA for court-martial service. But at the outset, we observe that these factors are not exhaustive, nor a checklist, but merely a starting point for evaluating a challenge alleging an

18

impermissible members selection process.  Indeed, we may conclude, as we do in this case, that a method of members selection that does not implicate any of these three factors may still be impermissible and erroneous.

First, we will not tolerate an improper motive to pack the member pool.  See Hilow, 32 M.J. at 440; Smith, 27 M.J. at 249-50.  Second, systemic exclusion of otherwise qualified potential members based on an impermissible variable such as rank is improper.  See Kirkland, 53 M.J. 23; Daigle, 1 M.J. 139.  Third, this Court will be deferential to good faith attempts to be inclusive and to require representativeness so that court-martial service is open to all segments of the military community.  See White, 48 M.J. at 254; Crawford, 15 C.M.A. at 31, 35 C.M.R. at 3.

In applying these factors to the present case, we view the issue of impermissible screening of the panel pool as one that invites de novo review.  See Kirkland, 53 M.J. at 24 ("Whether a court-martial panel was selected free from systematic exclusion is a question of law which we review de novo.").  However, we are bound by the military judge's findings of fact unless they are "clearly erroneous."  Benedict, 55 M.J. at 454.  Finally, "The defense shoulders the burden of establishing the improper exclusion of qualified personnel from the selection process."  Kirkland, 53 M.J. at 24 (citing Roland, 50 M.J. at 69).  "Once

the defense establishes such exclusion, the Government must show by competent evidence that no impropriety occurred when selecting appellant's court-martial members."  Id.

Applying that framework here, we conclude that Appellant has not met his burden of establishing the improper exclusion, with an improper motive, of qualified personnel from the selection process.  Although Appellant attempted to establish that the pool was selected for his court-martial with an improper purpose or intention to "stack" the panel, the record belies this assertion.  The ASJA explained in detail that his reason for soliciting volunteers was to generate a pool of members that would be available to serve in four courts-martial. The ASJA's action of identifying potential enlisted members who were ineligible to serve on Appellant's court-martial corroborates the ASJA's statement that he was concerned with obtaining a pool that could serve in other cases.  Moreover the ASJA testified that he made every effort to ensure that the panel members in the pool were impartial and fair.  Importantly, he discussed his method of obtaining the pool of volunteers with the SJA and military seniors and explained it to an SJA at a different command.  The transparency of the ASJA seeking volunteer members suggests that he had no improper motive in his attempt to develop a pool of potential members.  Finally, the ASJA advised the CA that he had the option to select other

20

officers from throughout the command, and other members would be solicited if he requested them. On these facts, the issue of unlawful court stacking was not raised. See United States v. Upshaw, 49 M.J. 111 (C.A.A.F. 1998).

The military judge and the lower court both correctly concluded that there was not an exclusion with an improper motive of a class of qualified servicemembers from possible consideration by the CA. There was no exclusion based on rank, race, or gender. None of the exclusions of servicemembers in other cases that caused this Court to reject preliminary screening of members is present in this case.

We acknowledge that non-volunteers were excluded from the initial members pool. But we agree with the military judge and the lower court who rejected "Appellant's argument that non-volunteers are a discrete group that cannot be excluded without violating his substantial rights." Dowty, 57 M.J. at 714. Moreover, Appellant has made no showing that this result directly impacted the fabric of the panel pool. Although Appellant asserts generally that volunteers may have brought their own agenda to the court-martial, the military judge conducted voir dire of each member to establish the circumstances of the member volunteering. The reasons for volunteering given by every panel member establish only good intentions of each member and no basis to question their motive.

21

This conclusion is supported by defense counsel not challenging any individual volunteer for reasons related to volunteering for the panel service. In fact, four of the seven members who actually served in this case were not volunteers.

Finally, we need not speculate as to whether the solicitation of volunteers was an attempt to improve the representativeness of the court-martial service. The ASJA never offered this justification for his action. So this factor is not relevant to our inquiry.

Notwithstanding our finding none of the impermissible screening of potential members that we have found in past cases, we conclude that it was error to inject into the panel selection process the irrelevant variable of a servicemember volunteering to be a member, and we reject the "novel and potentially troubling" method used here to identify volunteer members for the panel pool. This conclusion is consistent with the current federal practice.

Article 36, UCMJ, 10 U.S.C § 836 (2000), delegates to the President the authority to prescribe "[p]retrial, trial, and post-trial procedures, including modes of proof," in courts-martial, applying insofar as practicable "the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts," so long as not inconsistent with the UCMJ. "The implication is that

Congress intended that, to the extent 'practicable,' trial by court-martial should resemble a criminal trial in a federal district court." United States v. Valigura, 54 M.J. 187, 191 (C.A.A.F. 2000). Notwithstanding the significant structural difference between court-martial panels and civilian juries, this Court has applied this Article 36 mandate to issues relating to selecting panel members. See United States v. Witham, 47 M.J. 297, 298 (C.A.A.F. 1997) (applying to courts-martial the federal rule that a criminal defendant may not exercise a peremptory challenge on the basis of race or gender). Applying this precedent to the present case, we now consider the "federal rule" relating to service of volunteers as jurors.

That "federal rule" is simply that the use of volunteers "violate[s] both the letter and spirit of the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861-1869 . . . and its requirement of random selection." United States v. Kennedy, 548 F.2d 608, 609 (5th Cir. 1977). The Fifth Circuit could not be more clear in its explicit rejection of using volunteers as jurors. "We condemn the practice, note its apparent demise, and put all districts under our jurisdiction on notice that its resurrection shall not be brooked." Id.

The statute required the clerk to "draw at random from the qualified jury wheel [also based on a random drawing from voter registration list] . . . names of persons . . . required for . .

. jury panels." 28 U.S.C. § 1866(a). In Kennedy, the jury clerk, pursuant to standing authorization of the chief judge of the district, obtained volunteers from the list of persons who had completed jury service in the prior term. Weighing this violation against the goal of the statute to achieve random selection from a fair cross section of the community, the court found that this was a "substantial failure to comply" with the statute. Id. at 611-12. Ultimately, the Court granted no relief as the Appellant failed to properly challenge the jury selection by the method required in the statute. Id. at 612-13.

The linchpin of the Kennedy decision is that Congress designated a procedure to develop a jury panel and the use of volunteers was "a substantial variable, not contemplated by the Act's few, narrow categories of qualifications, exemptions, and excuses, [that] has confounded the selection process." Id. at 612. This reasoning applies to the present case.

Congress in Article 25(b)(2) also established a procedure to obtain members for a court-martial. In the present case, the use of volunteers was also an irrelevant variable injected into the selection of the panel pool. We embrace the approach of the Court of Appeals in Kennedy and will "not speculate as to what sort of biases will be reflected in a jury chosen on the basis of its members' willingness to depart from their daily business and serve as jurors." Id. We, persuaded by the logic and

authority of the federal rule as stated in Kennedy, simply condemn the practice of soliciting only volunteers for the panel pool.

> ### B. Evaluation of prejudice from the improper preliminary screening of panel members

Our rejection of this practice requires this Court to evaluate the impact of this error in the context of the military justice system. See Daigle, 1 M.J. at 139. However, this Court has not clearly stated the allocation of the burden regarding the demonstration of prejudice in circumstances like the present case that involved the improper use of command authority preliminarily to screen members but did not implicate the issue of command influence. Compare id. (testing for prejudice from improper selection of court members but not clearly allocating the prejudice burden) and Roland, 50 M.J. at 69 ("Once the defense comes forward and shows an improper selection, the burden is on the Government to demonstrate that no impropriety occurred.") with Upshaw, 49 M.J. at 113 (allocating to the Appellant the burden "[w]here administrative mistakes occur in detailing court members"). In the present case, error in preliminarily screening the members was not merely an "administrative mistake." As the error was more egregious, we conclude that the Government has the burden to demonstrate that the error did not "materially prejudice the substantial rights

of the accused." See Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2000). In so doing and evaluating the prejudice in this case, we focus on the motive of those involved in the preliminary screening of panel members, the nature of the preliminary screening variable of volunteerism, and its impact on the selection of the members.

Importantly, as we have previously stated, there is no showing of an improper motive by anyone involved in the nomination or selection of the members. See Upshaw, 49 M.J. at 113 (stating that "where the convening authority's motive is benign, systematic inclusion or exclusion may not be improper"). Next, we observe that the preliminary screening variable of volunteerism is irrelevant. There is no showing that this variable operated to exclude a discernable group or to diminish the representative nature of the pool. See Kennedy, 548 F.2d at 614. Appellant has failed to show how non-volunteers were different as a group than volunteers or how any of the three individual volunteers in this case was different from the four non-volunteers. Also it is clear that the use of volunteers in the military justice case was not as offensive as their use to select a civilian jury. The policy concern for a random selection and a fair cross section essential in selecting a civilian jury, is not applicable in the military justice system. See Tulloch, 47 M.J. at 285.

The focus of our concern is therefore on whether the use of volunteers thwarted the congressional procedure in Article 25(b)(2) for selection of "best qualified" members. To evaluate this impact, we must now examine two dimensions of the panel selection in this case - the advice to the CA regarding his selection of the members and the actual process of the CA personally selecting the members on this panel.

### 1. The advice to the CA as he selected the members of the panel

In Article 25, Congress has provided members of the armed forces with a valuable protection by requiring that the CA personally select those members of the armed forces "best qualified" to serve as court members by reason of judicial temperament and related statutory criteria. We now address whether this protection was honored in this case.

In Hilow, we emphasized that in discharging his Article 25 powers, the CA must be "fully informed of any attempts to 'stack' the court-martial panel or any other matters which may cast doubt on the fairness of the proceedings." 32 M.J. at 442. While we do not find any attempt to stack the court-martial in this case, we do perceive the unorthodox method to obtain the panel pool as a matter which was so unusual that it was problematic and arguably raised questions regarding the appearance of fairness of the panel. Therefore, it was a matter

27

about which the ASJA should have advised the CA before he selected the members.

In light of this failure to advise the CA, we have elected to address the issue Appellant asserts for the first time at this Court, that the ASJA's advice regarding the Article 25(b)(2) statutory criteria for the CA to select members was also deficient.

It is well settled that "[o]rdinarily, an objection to the method of selection of the triers of the facts must be made before trial." Crawford, 15 C.M.A. at 33, 35 C.M.R. at 5. Appellant's failure to make this precise objection either at trial or before the lower court gives us pause, but in the past we have "pass[ed] over the procedural deficiency to reach the substance of the issue." Id. at 34, 35 C.M.R. at 6. The unusual circumstances surrounding the selection of the members invite us in this case to respond to Appellant's complaint.

It is not disputed that the ASJA's advice to the CA was deficient. See Article 25(d)(2), UCMJ. The AJSA's written advice identified these four factors for the CA to consider in selecting court members: age, training, length of service, and judicial temperament. This advice omitted the statutory factors of experience and education.

However, this error did not taint the CA's personal selection of the members. The facts as found by the military

28

judge demonstrate the CA's use of the member questionnaires, which included extensive information regarding education and experience of the potential members when he selected the members. The record supports these facts. The CA stated that he reviewed the member questionnaires in making his selection. This detailed information on each member addressed both the factors of experience and education.

Each questionnaire presented the military experience of the member for the "last 10 years plus any significant or unusual billets" and experience in the military justice system. Appellate Exhibit XXXIII at Court Member Questionnaire. Also, each member questionnaire presented a detailed summary of the educational background of each member including from high school through graduate education, degrees, fields of study, and legal education and courses. Appellate Exhibit XXXIII at Court Member Questionnaire. In this case, the CA expressly stated that he considered the questionnaires, and the questionnaires presented this detailed information of each member's experience and education. In our view, the combination of these circumstances sufficiently established that the CA applied the criteria of Article 25, UCMJ, when he selected these members and removed any claim of prejudice attendant to the omission of the experience and education criteria from the SJA advice.

## 2. The CA's
## personal selection of the members

Notwithstanding the previously discussed issues relating to the identification of the members pool and the deficient advice to the CA, we are satisfied that the CA personally selected the members of Appellant's court-martial.  Appellant does not challenge that the CA personally selected a majority of the members (four of the seven) who were not in the volunteer pool and that he added by the final modification of the convening order.  The sole issue is whether the CA personally selected the three volunteers who eventually served as members.

The judge in ruling on this issue was right on the mark when he stated that the defense's proof in support of the motion challenging the selection process "both raised the issue and defeated it."  The judge was correct that it was the defense evidence that unequivocally established the CA personally selected the members.

In Appellate Exhibit XXXIII, which the military judge admitted as evidence on the motion, the defense presented an unrebutted explanation of the CA as to how he personally selected the panel members.  In this exhibit, the CA explained that he relied "solely upon the 15 member questionnaires in making his decision."  Other statements of the CA in this defense exhibit provide further reassurances that the CA's

selection of the members was free of any improper influence by the ASJA.  The CA stated that he selected the panel members and did not review the list of nominations submitted by the ASJA until after he had selected the panel.  He also stated that he did not even know who had prepared the list of nominees.  The CA did not select one of the ASJA's nominees and in fact selected a member from the panel pool that the ASJA had not selected.  This further corroborates the CA's assertion of his independent selection of the members.  Finally, and most importantly, the CA stated that he marked Exhibit 2 to indicate his selection of members and personally signed it.  This document bears his signature.  The CA later also personally signed the convening order modification reflecting his selection of these members.

In light of these statements of the CA, placed in the record by the defense, establishing that the CA personally selected the members, it was not necessary that he personally appear as a witness at the court-martial to explain his actions. We conclude that the military judge's finding of fact that the CA personally selected the panel is not clearly erroneous.  See Benedict, 55 M.J. at 455 (concluding that testimony of convening authority and personal signature on convening order support finding of the military judge that convening authority personally selected members).

31

## C. Summary

We hold that under the unique facts of this case, the CA personally selected the panel and applied the criteria of Article 25(d), thereby curing any error arising from screening of the panel pool using the impermissible variable of volunteer. The Government has carried its burden to demonstrate no prejudice from this error. This is not to say that the convening authority's proper and personal selection of the members can cure all impermissible screening. See Hilow, 32 M.J. at 442 ("[W]e have never held that the impact of [command subordinates'] improper assistance can be ignored solely on the basis of the CA's official duty to personally select the members in accordance with the criteria of Article 25(d)(2).").

Previously we have addressed separately each of the Appellant's objections to the selection and service of volunteer members on the panel and to the erroneous ASJA advice to the CA. However, we have also considered their collective effect and find that there is no appearance of unfairness arising from the service of any of the volunteer members in this case. See United States v. Marsh, 21 M.J. 445 (C.M.A. 1986).

The amicus in this case identifies several issues relating to the process of members selection and the involvement of the CA and the SJA in selecting members. The amicus also invites this Court's consideration of these issues in light of this

Court's supervisory role as the highest court in the military justice system. See Eugene R. Fidell, Guide to the Rules of Practice and Procedure for the United States Court of Appeals for the Armed Forces 32-34 (11th ed. 2003)(collected cases where this Court invited rulemaking action or consideration by Congress when it has identified needed improvements to the military justice system).

The amicus position reflects longstanding expressions of concern regarding the present process for selecting members. See, e.g., Smith, 27 M.J. at 252 (Cox, J., concurring)(calling the method of the CA selecting members "the most vulnerable aspect of the court-martial system; the easiest for critics to attack"). See also Honorable Walter T. Cox, III et al., Report of the Commission on the 50th Anniversary of the Uniform Code of Military Justice (May 2001)(recommending modifying the role of the convening authority in selecting court-martial members); 2 Francis A. Gilligan & Fredric I. Lederer, Court-Martial Procedure 14, ¶ 15-3100 (2d ed. 1991)("Arguably, the most critical and least necessary vestige of the historical origins of the military criminal legal system is the personal appointment of the members by the convening authority."); Kenneth J. Hodson, Military Justice: Abolish or Change?, 22 Kan. L. Rev. 31 (1973), reprinted in Mil. L. Rev. Bicent. Issue 577, 605 (1975)(proposing that "commanders, at all levels, be

completely relieved of the responsibility of exercising any function related to courts-martial except, acting through their legal advisors, to file charge with a court for trial, to prosecute, and, in the event of conviction, to exercise executive clemency by restoring the accused to duty.").

But long ago regarding this matter of members selection we stated, "[t]his Court sits as a judicial body which must take the law as it finds it, and that any substitution of a new system of court selection must come from the Congress . . . ." Kemp, 22 C.M.A. at 154, 46 C.M.R. at 154. Today, we heed that wise admonition and, after applying the law to the facts, conclude simply there was error in this "novel" attempt to solicit volunteers to serve as court members. We, however, also find no material prejudice to Appellant's substantial rights.

DECISION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

EFFRON, Judge (dissenting):

As the Supreme Court has noted, "trial by jury in criminal cases is fundamental to the American scheme of justice." Duncan v. Louisiana, 391 U.S. 145, 149 (1968). See also Taylor v. Louisiana, 419 U.S. 522 (1975) (requiring jury selection from a random cross-section of the community); Baldwin v. New York, 399 U.S. 66 (1970) (requiring trial by jury in all criminal cases when the sentence may include confinement in excess of 6 months).

Congress has determined that the disciplinary needs of the armed forces require use of a different procedure in courts-martial. Under the Uniform Code of Military Justice [hereinafter UCMJ], there is no right to trial by jury. The convening authority - the commander who exercises prosecutorial discretion - selects the court-martial panel. See Article 25, UCMJ, 10 U.S.C. § 825 (2000); Rules for Court-Martial 407, 503; United States v. Smith, 27 M.J. 242 (C.M.A. 1988).

Congress, however, did not provide the convening authority with unfettered discretion in selecting the panel that would decide the fate of an accused service member. As the majority opinion notes, a service member has the right to a panel that is fair and impartial. ___ M.J. (15)

(citing United States v. Roland, 50 M.J. 66 (C.A.A.F. 1999)).  The convening authority must personally select the members of the panel according to specific statutory criteria, a function that may not be delegated.  ___ M.J. (16-17)(citing United States v. Ryan, 5 M.J. 97 (C.M.A. 1978); Article 25(d)(2), UCMJ).  To the extent that a convening authority relies on staff assistance in selecting a court-martial panel, the staff cannot narrow the pool through criteria that are not within the qualifications established by Article 25.  See ___ M.J. (27-28).

In the present case, the assistant staff judge advocate narrowed the pool to 22 potential officer members without applying the qualifications of Article 25.  The sole criterion was self-qualification by volunteers.  The lead opinion agrees that this process was impermissible, but concludes that the error was not prejudicial.

In testing for prejudice, the lead opinion appropriately focuses on whether the use of volunteers thwarted the congressional requirement for selection of the "best qualified" members under Article 25(d)(2).  There were three critical errors in this case.  First, the staff did not apply the criteria in Article 25 in establishing a potential pool of members.  Second, the assistant staff judge advocate did not advise the convening authority that

the staff had deviated from the standard use of Article 25 criteria, but instead had relied on volunteers.  Third, the assistant staff judge advocate advised the convening authority to use four criteria when selecting the panel, advice that omitted two of the statutory criteria in Article 25 - experience and education.

The lead opinion concludes that these errors were not prejudicial because the panel was selected by an experienced convening authority who personally reviewed the questionnaires of the potential members that had been selected by his staff, which included information pertinent to the experience and education of the potential panel members.  I respectfully disagree.

To the extent that this convening authority had experience in the selection of panel members, it would have been reasonable for him to rely on his staff to apply the criteria set forth in Article 25 in narrowing the pool. They did not.  Moreover, it would have been reasonable for him to rely on the assistant staff judge advocate to advise him correctly on the criteria he was required to apply in selecting the panel.  That advice, however, was defective because it omitted one-third of the statutory criteria. Although the convening authority may have used benign criteria in shaping the panel, he did so applying defective

standards to a pool that had been impermissibly narrowed by his staff.

In short, we have a flawed process that produced multiple felony convictions.  We have a criminal record that not only was imposed without a trial by jury, but through a process that failed to apply the procedures established by Congress in lieu of trial by jury.  These errors were compounded by the fact that the staff failed to inform the convening authority that they had used a deviant procedure to narrow the pool, and by the staff's erroneous advice regarding the criteria that the convening authority was required to apply under Article 25.  Under these circumstances, I respectfully dissent.