# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**K.J. BRUBAKER, M.C. HOLIFIELD, A.Y. MARKS**
Appellate Military Judges

**UNITED STATES OF AMERICA**

v.

**FABIAN J. THOMPSON**
**AVIATION BOATSWAIN'S MATE FIRST CLASS (E-6), U.S. NAVY**

**NMCCA 201400072**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 9 August 2013.
**Military Judge:** CDR Colleen Glaser-Allen, JAGC, USN.
**Convening Authority:** Commander, Naval Air Force Atlantic, Norfolk, VA.
**Staff Judge Advocate's Recommendation:** CAPT T.J. Welsh, JAGC, USN.
**For Appellant:** Maj John J. Stephens, USMC.
**For Appellee:** LCDR Keith Lofland, JAGC, USN; LT Amy L. Freyermuth, JAGC, USN.

**25 August 2015**

---
## OPINION OF THE COURT
---

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

BRUBAKER, Senior Judge:

A panel of officer and enlisted members sitting as a general court-martial convicted the appellant, contrary to his pleas, of a single specification of aggravated sexual assault in violation of Article 120, Uniform Code of Military Justice, 10

U.S.C. § 920.[1]  The members sentenced the appellant to confinement for one year, reduction to pay grade E-1, and a bad-conduct discharge.  The convening authority (CA) approved the sentence as adjudged.

The appellant raises three assignments of error (AOEs): (1) the evidence admitted at trial was legally and factually insufficient to support a conviction; (2) the CA's instruction restricting eligibility for court-martial membership frustrated the appellant's right to a properly convened court-martial; and (3) the Government's failure to disclose requested material related to the member selection process was reversible error.

This is our second review of this case.  In a previous decision, we found the Government failed to meet its burden to to demonstrate a lack of prejudice to what we concluded was a systematic exclusion of potential members by rank; we accordingly set aside the findings and sentence.  *United States v. Thompson*, No. 201400072, 2015 CCA LEXIS 153, unpublished op. (N.M.Ct.Crim.App. 21 Apr. 2015) ("*Thompson I*").  Having granted a Government motion to attach documentary evidence and to reconsider, we find the Government now *has* met its burden.  We therefore find no error materially prejudicial to the substantial rights of the appellant and affirm the findings and the approved sentence.  Arts. 59(a) and 66(c), UCMJ.

## Factual Background

During a port call to Dubai, United Arab Emirates, in late April 2012, the appellant, the alleged victim (Aviation Boatswain's Mate (Equipment) Second Class (ABE2) LB, and a number of other shipmates were staying at a local hotel.  On the evening of 26 April 2012, several of these Sailors, including the appellant and ABE2 LB, were at the hotel's pool enjoying dinner and drinks.  Sometime after midnight, the group moved to the appellant's room on the second deck, where they continued to drink and socialize.

Over the next several hours, ABE2 LB had several vodka drinks, although the amount of alcohol she consumed is unclear from the record.  By 0200, ABE2 LB's level of intoxication was described as "loud, obnoxious, happy . . . slurring a bit . . . [but] wasn't stumbling [or] couldn't hold her balance."[2]  Around

---

[1] As the offense allegedly occurred on 27 April 2012, the version of Article 120, UCMJ in effect from 1 Oct 2007 through 27 June 2012 applies.

[2] Record at 761.

0230, ABE2 LB lay down on the appellant's bed and fell asleep. One attendee began "messing with her, trying to irritate her"[3] by, for example, changing the position of her feet. At first, ABE2 LB, known to be a heavy sleeper, "kind of like just shrug[ged] it off, but after that, she just—she didn't respond to it."[4]

Shortly thereafter, a female attendee, Master-at-Arms Second Class (MA2) P, stated they needed to move ABE2 LB to her own room. With difficulty, MA2 P roused ABE2 LB and told her she had to go back to her room.[5] Several witnesses described her at this point as "very intoxicated"[6] and nonresponsive. ABE2 LB was helped onto Aviation Boatswain's Mate (Equipment) First Class (ABE1) O's back and was carried "piggy-back" to her room on the fourth deck. ABE1 O described ABE2 LB as "passed out"[7] as he carried her and "still out"[8] when he laid her in her bed; video partially confirms and partially contradicts this as it shows ABE1 O carrying ABE2 LB, but, while opening the door to her room, putting her down and her standing on her own with the help of his steadying arm. ABE1 O left ABE2 LB's room key beside her bed and departed for his room.

Ten minutes later, the appellant is seen in security camera footage in the foyer to ABE2 LB's door for approximately two minutes, apparently knocking in an attempt to gain entry. He asserted he was trying to retrieve a computer power cord he had loaned ABE2 LB earlier in the port call. There was no answer. He then went to the front desk and obtained a key to ABE2 LB's room. Returning to the fourth deck, he used the key to enter ABE2 LB's room.

At this point the accounts of the appellant and ABE2 LB diverge. The appellant testified that, as he was getting the power cord, ABE2 LB called him over to the bed. She then took his hand and moved it to her vaginal area as he lay down beside

---

[3] *Id.* at 762.

[4] *Id.* at 764.

[5] ABE2 LB did not initially respond to efforts to wake her until MA2 P "got in her ear and told her, '[LB], I need you to get your butt up so that you can go to your room.'" *Id.* at 783.

[6] *Id*. at 821.

[7] *Id*. at 894.

[8] *Id*. at 896.

her. After a few minutes she climbed atop him and began "dry-humping" him; both were still wearing underwear at this point. The appellant claims ABE2 LB proceeded to remove her underwear and the pair engaged in consensual sexual intercourse with her on top. After some minutes she rolled off of him. He was then surprised when she asked, "Who is this?" and demanded to be taken to her room.[9] The appellant replied, "It's Thompson," and informed her she was already in her room.[10] ABE2 LB lay on the bed for a minute before getting up, entering the bathroom, and then leaving the hotel room.

ABE2 LB claims she remembered nothing regarding how she got to her room. She testified that she was awakened by a man having intercourse with her. When she asked who it was, the man replied "Thompson."[11] Although she told him to stop, he flipped her over and attempted to sodomize her. Screaming from the pain, she was then flipped back over and the vaginal intercourse resumed. She testified she then "ran to the bathroom . . . grabbed a towel . . . ran out of [her] room to the elevator,"[12] and went to the room of MA2 P and another friend, MA2 M. The hotel video shows her leaving the room with a towel wrapped around her, but does not show her running at any point. The video then shows the appellant emerging from the room shortly thereafter—a total of approximately 21 minutes after he entered ABE2 LB's room—glancing one direction, then running the other.

ABE2 LB arrived at MA2 P and MA2 M's room crying and wearing only a bra and a towel. MA2 P asked ABE2 LB what was wrong. At first, ABE2 LB did not respond, but eventually answered affirmatively that someone had touched her. MA2 P then looked at ABE2 LB's vagina and observed it was swollen and "inside out."[13] After repeated questioning about who it was, ABE2 LB finally responded, "He said his name was Thompson."[14]

The appellant, meantime, went to his room, where he immediately changed his underwear and shirt because he believed

---

[9] *Id.* at 1304.

[10] *Id.*

[11] *Id.* at 935.

[12] *Id.* at 935.

[13] *Id.* at 765.

[14] *Id.*

4

ABE2 LB's "bodily fluids"[15] would be on them.  Shortly thereafter, when confronted by MA2 P, the appellant denied having had sex with ABE2 LB, claiming he had been in his room the entire time.

ABE2 LB remained in MA2 P and MA2 M's room the rest of the night.  After she expressed her vagina was throbbing and in pain, MA2 P and MA2 M helped ABE2 LB, who insisted initially on not reporting the incident, take a bath.  ABE2 LB repeatedly awoke throughout the night crying and vomiting.

Although ABE2 LB initially "begged" her friends to "just leave it alone"[16] and not further inquire into or report the matter, she eventually reported the incident to law enforcement authorities the next morning.  That evening, she underwent a Sexual Assault Nurse Examination (SANE).  The nurse examiner found no apparent trauma to ABE2 LB's vagina or anus.

Subsequent laboratory testing revealed the presence of both the appellant's and ABE2 LB's DNA in the former's underwear.  The testing also revealed fibers consistent with the appellant's underwear were present on ABE2 LB's underwear.

### Sufficiency of Evidence

The appellant's first AOE focuses on ABE2 LB's intoxication, claiming that the evidence did not establish that she was unable to decline participation in the sexual act.  We disagree.

1. *Legal sufficiency*

The test for legal sufficiency is whether, considering the evidence in the light most favorable to the Government, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt.  *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987); *United States v. Reed*, 51 M.J. 559, 561-62 (N.M.Crim.Ct.App. 1999), *aff'd*, 54 M.J. 37 (C.A.A.F. 2000); *see also* Art. 66(c), UCMJ.

The elements of aggravated sexual assault, as charged in the present case, are:  (1) That the accused caused another

---

[15] *Id.* at 1308.

[16] *Id.* at 767.

5

person, who is of any age, to engage in a sexual act; and (2) that the other person was substantially incapable of declining participation in the sexual act. MANUAL FOR COURTS-MARTIAL, UNITED STATES (2008 ed.), Part IV, ¶ 45. Here, the testimony of both the appellant and ABE2 LB as well as forensic evidence support a finding that a sexual act occurred. The testimony of the various witnesses, as well as ABE2 LB's own testimony, supports a finding of substantial incapability to decline participation. Thus, we find the evidence to be legally sufficient.

2. *Factual sufficiency*

The test for factual sufficiency is whether, after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses, this court is convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325; *see also* Art. 66(c), UCMJ. Proof beyond a reasonable doubt does not mean that the evidence must be free from conflict. *United States v. Goode*, 54 M.J. 836, 841 (N.M.Ct.Crim.App. 2001). The fact finder may believe one part of a witness' testimony and disbelieve another. *Id.* When weighing the credibility of a witness, this court, like a fact finder at trial, examines whether discrepancies in witness testimony resulted from an innocent mistake, such as a lapse of memory, or a deliberate lie. *Id.* at 844.

The record undoubtedly raises concerns regarding ABE2 LB's credibility. First, during the SANE, ABE2 LB denied having had consensual sexual intercourse with anyone in the previous five days. At trial, however, she admitted having had sex with another man on the day before the events in question. Second, ABE2 LB provided a sworn statement to the Naval Criminal Investigative Service (NCIS) in which she claimed, "I have never had any kind of romantic relationship with Thompson or given him the idea that I wanted to."[17] She repeated this denial under oath at trial. This, however, was contradicted not only by the appellant, but by two witnesses who testified they personally observed the appellant and ABE2 LB engaging in sexual activity in their presence in October 2011. While the specific details recalled by the witnesses varied, the substance of their testimony was challenged only by ABE2 LB's denial.

Nevertheless, the fact she may have been lying about these two matters does not necessarily lead to the conclusion that she was lying about the core allegations; having had the opportunity

---

[17] *Id*. at 1137.

6

to observe all the witnesses at trial, the members chose to believe some parts of her testimony and not others, which they are free to do. *Goode*, 54 M.J. at 841. We likewise are convinced beyond a reasonable doubt. The specification of which the members convicted the appellant was supported by strong corroborative, albeit circumstantial, evidence, including not only ABE2 LB's well-documented reaction of immediate shock and distress and prior consistent statements, but the appellant's own testimony that after the sexual act, ABE2 LB was not aware of who he was or even that she was in her own room. It is also supported by evidence of the appellant's consciousness of guilt, from furtively fleeing the scene, to changing his clothes, to lying about any sexual encounter with ABE2 LB.

The appellant further maintains that even setting aside ABE2 LB's credibility, evidence regarding her level of intoxication prior to and following the incident supports that the appellant had a reasonable mistake of fact. We disagree. Evidence that half an hour prior to falling asleep or passing out on the appellant's bed and immediately following the incident, ABE2 LB was able to walk without stumbling, for instance, does little to contradict the evidence that she fell into a deep, alcohol-assisted sleep and had to be assisted to her room. The appellant was present as others messed with her as she slept, then struggled to rouse her and carried her out. The appellant admitted going to her room shortly after this and knocking on her door for approximately two minutes with no response, a further indication of the appellant's knowledge of ABE2 LB's condition. Given all the evidence, we are convinced beyond a reasonable doubt that the appellant knew or reasonably should have known that ABE2 LB was incapable of declining participation in the sexual act.

## Panel Member Selection

The appellant's next two AOEs relate to the panel member selection process. First, he asserts that members below the pay grade of E-7, above the pay grade O-5, and all warrant and chief warrant officers were impermissibly and systematically excluded from the nomination process by the CA. In July 2008, Commander, Naval Air Force Atlantic (COMNAVAIRLANT) issued an instruction[18] to subordinate commands establishing the procedure for nominations of prospective court-martial members. That instruction directed each subordinate command to provide a

---

[18] COMNAVAIRLANTINST 5813.1H, 29 July 2008.

certain number of nominees in the grades of O-5, O-4, "LT [Lieutenant] or Below" and "Enlisted (E7/E8/E9)."[19]  The instruction did not call for nominees below E-7, regardless of how junior a particular appellant may be, and did not call for anyone O-6 or above.[20]  The court-martial convening order and its two amendments for this case detailed no E-7s and below, no Warrant or Chief Warrant Officers, and no O-6s and above.

Second, the appellant alleges a discovery violation as he was not provided a copy or aware of the existence of the instruction until after the trial concluded—despite his pre-trial request for such matters.  The trial defense counsel thus did not raise the allegation of impermissible exclusion by rank at trial, raising it for the first time in his post-trial clemency matters.

*Impermissible Exclusion*

We review claims of error in the selection of court-martial members *de novo.  United States v. Kirkland* 53 M.J. 22, 24 (C.A.A.F. 2000).  We look at three primary factors to determine whether an impermissible member selection has taken place:

1. Improper motive in packing a member pool;

2. Systematic exclusion of potential members based on rank or other impermissible variable; and,

3. Good faith attempts to be inclusive and open the court-martial process to the entirety of the military community.

*United States v. Dowty*, 60 M.J. 163, 171 (C.A.A.F. 2004).  If either of the first two criteria is present, the process is impermissible.  *Id.*  These criteria are not only considered in the actual panel selection process, but also in the process of presenting nominations to the CA.  *United States v. Roland*, 50 M.J. 66, 69 (C.A.A.F. 1999).

In a case of systematic exclusion of members by rank, it is the responsibility of the defense to establish the improper exclusion.  *Kirkland*, 53 M.J. at 24.  Once improper exclusion

---

[19] *Id.* at 2.

[20] It is unclear, as the Government concedes, whether the "LT or Below" language intended only O-1 to O-3 nominees or permitted nomination of warrant and chief warrant officers.

8

has been shown, the burden shifts to the Government "to demonstrate that the error did not 'materially prejudice the substantial rights of the accused.'" *Dowty*, 60 M.J. at 173 (quoting Art. 59(a), UCMJ).

In assessing whether the Government has carried its burden to demonstrate a lack of prejudice, we consider whether:

> (1) the convening authority enacted or used the instruction with a proper motive; (2) the convening authority's motivation in detailing the members he assigned to the court-martial panel was benign; (3) the convening authority who referred the "case to trial was a person authorized to convene" the court-martial; (4) the appellant "was sentenced by court members personally chosen by the convening authority from a pool of eligible" members; (5) the court members "all met the criteria in Article 25, UCMJ;" and (6) "the panel was well-balanced across gender, racial, staff, command, and branch lines."

*United States v. Ward*, 74 M.J. 225, slip op. at 9 (C.A.A.F. 2015) (quoting *United States v. Bartlett*, 66 M.J. 426, 431 (C.A.A.F. 2008).

We applied the above analytical approach in *Thompson I*. We found the appellant established that the instruction had the effect of improperly excluding potential members from the selection process on the basis of rank and that the burden thus fell on the Government to demonstrate a lack of harm. We then held the Government failed to meet its burden because it offered no evidence by which we could assess prejudice.

Subsequent to our decision, the Government made its first motion for reconsideration—yet inexplicably *still* failed to offer any competent evidence by which we could assess prejudice and the Government could meet its burden. However, shortly after the United States Court of Appeals for the Armed Forces' (CAAF) decision in *Ward*, a case analyzing the same instruction, the Government made a second motion for reconsideration. Although beyond prescribed time limits, *this* time they also moved to attach affidavits from the CA and his Force Judge Advocate.[21]

---

[21] The Force Judge Advocate at the time was Captain Frederick D. Mitchell, U.S. Navy, who is now Chief Judge of this court. Captain Mitchell has recused himself from any participation in or discussion of this case.

The appellant filed a spirited opposition to the Government's untimely motions, asserting that under the Courts of Criminal Appeals Rules of Practice and Procedure, which are incorporated into this court's Rules of Practice and Procedure, it is "obligated to deny the Government's Second Motion for Reconsideration *en banc*."[22] He further contended the request should be denied because the original decision was correct, even accounting for the CAAF's recent decision in *Ward*.

While the full court denied the request for *en banc* reconsideration, we granted panel reconsideration and the motion to attach the affidavits, despite both being untimely. We briefly discuss our rationale for doing so before moving to the merits of the matter.

The appellant correctly points to Rule 19(b) of the Rules of Practice and Procedure, which provides, in pertinent part, that we may, in our discretion, reconsider a prior decision upon a motion filed by appellate government counsel *within 30 days after the decision is received by counsel*. The Government's second motion for reconsideration was filed substantially after that time period had passed. Rule 24, however, provides that we may, in our discretion, extend any time limits prescribed and Rule 25 states we may, for good cause shown, suspend the requirements or provisions of any of the rules. This authority is limited, however, by Rule 19(d), which provides:

> The time limitations prescribed by this rule shall not be extended under the authority of Rule 24 or Rule 25 beyond the expiration of the time for filing a petition for review or writ appeal with the United States Court of Appeals for the Armed Forces, except that the time for filing briefs by either party may be extended for good cause.

At the time the Government filed its second motion for reconsideration, it was still within its timeframe for filing a certificate of review with the CAAF. *See* CAAF Rules of Practice and Procedure 19(b)(3) and 34(a) (a certificate for review shall be filed no later than 60 days after final action on a timely filed petition for reconsideration). Accordingly, contrary to the appellant's assertion, we have the authority to suspend operation of Rule 19(b) and extend the time limit for the Government to move for reconsideration.

---

[22] Appellant's Response to Appellee's Out-of-Time Motions for Leave to File a Second Motion for *En Banc* Reconsideration and Non-Consent Motion to Attach Affidavits to the Record filed on 14 Jul 2015 at 1.

We find there is good cause to do so.  The CAAF has explained that while "good cause" in the context of filing an untimely petition "does not lend itself to precise definition," it represents "a discretionary judgment on the part of this Court" that the movant "can establish some reasonable basis justifying . . . relief from that default.  We have also said that as part of this showing of good cause counsel should assign some meritorious issue." *United States v. Tamez*, 63 M.J. 201, 203 (C.A.A.F. 2006) (citations and internal quotation marks omitted).  Applying this definition, we find there is a reasonable basis for relieving the Government of its default.

This is not based on the Government necessarily being able to justify its delay in offering competent evidence to meet its burden.  Indeed, we continue to be perplexed by the Government's failure to provide affidavits earlier in the appellate litigation of this case.  Despite their purported confusion over the difference in outcomes in *Thompson I* and other cases involving the same instruction—including *Ward*—it should have been apparent that in those other cases the Government offered the court competent evidence in the form of affidavits by which we could determine the Government met its burden—and that in this case they had not.  Presentation of competent evidence to meet a party's burden is a litigation basic, whether at a trial or appellate level.

Nonetheless, while we do not find *Ward* contrary to the analytical approach we followed in *Thompson I*, it is fair to say it addressed precisely the same instruction at issue here and clarified the legal standard for assessing prejudice resulting from it.  It also emphasized the importance the CAAF placed on post-trial affidavits in assessing prejudice.  *Ward* 74 M.J. 225, slip op. at 12 ("a review of the post-trial affidavits shows an honest, though erroneous, attempt to meet the requirements of both Article 25, UCMJ, and the command's mission").  At any rate, we are now presented the opportunity to reconsider the issue in light of the CAAF's recent guidance on it.

Further—and more importantly—the Government, at last offering competent evidence, can demonstrate merit to their contention that there was no prejudice resulting from the instruction.  Continuing to set aside the findings and sentence when we can now readily determine there was no prejudicial error would only represent a windfall to the appellant.

Turning to the merits, in reviewing the affidavits and the record as a whole, we find: (1) no evidence that the errant

11

instruction was issued with an improper motive; (2) no evidence that the CA had an improper motive when detailing the members assigned to the appellant's court-martial; (3) the CA was a person authorized to convene a general court-martial; (4) the CA was properly advised of his Article 25 responsibilities, and that he could pick any member of his command, not just those who had been nominated; (5) the court members were personally chosen by the CA from a pool of eligible candidates; and, (6) the court members all met the criteria in Article 25, UCMJ.[23] Under these circumstances, we are convinced that the appellant's case was heard by a fair and impartial panel, and that the error in this case was harmless. *See Bartlett*, 66 M.J. at 431.

*Discovery Violation*

In the course of the discovery process, the appellant requested all information which the CA and his advisors used in the nomination of prospective members and in the final selection of the court members for the court-martial orders issued in this case. The instruction discussed above, which had the effect of systematically excluding members based on rank, was not provided to the defense, despite their request.

Even assuming a discovery violation, we nonetheless decline to grant relief. When there has been a discovery violation, we test that violation for prejudice. In cases where the appellant either did not make a discovery request or made only a general request for discovery, the Government has the burden of proving that the error was harmless. However, in those cases where the appellant made a specific request for the undisclosed information, the Government must show that the error was harmless beyond a reasonable doubt. *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004).

We find the appellant's discovery request specific enough to trigger the heightened requirement of proof of harmlessness beyond a reasonable doubt. Nevertheless, even applying that higher standard, for the same reasons articulated above, we find

---

[23] Regarding the final *Bartlett* factor——whether the panel was well-balanced across gender, racial, staff, command, and branch lines——it should be noted that the lack of women and African-Americans on the panel was raised as an issue at trial. Nonetheless, as the military judge found below, the evidence indicates that the CA properly applied Article 25, UCMJ criteria and had no improper motive in making his selections. *See* Record at 523-25. Accordingly, we find that even to the extent the panel may *not* have been well-balanced across gender and racial lines, the Government on balance still has demonstrated a lack of prejudice.

12

that the appellant was tried by a fair and impartial panel and that the discovery error was harmless beyond a reasonable doubt.

## Conclusion

Accordingly, the findings and the sentence as approved by the CA are affirmed.

Judge MARKS concurs.

HOLIFIELD, Judge (dissenting):

I disagree with the majority's conclusion that the evidence presented at trial is factually sufficient. I therefore respectfully dissent.

The evidence presented at trial is relatively straightforward as it pertains to events before and after the appellant was in Aviation Boatswain's Mate (Equipment) Second Class (ABE2) LB's room on 27 April 2012. The question, of course, is what happened in the room. With little independent evidence to corroborate either description of events, the matter comes down to credibility.

The appellant's explanation is, on its face, neither unreasonable nor unbelievable. ABE2 LB did, in fact, have the appellant's computer power cord. Based on their long friendship and earlier instances where ABE2 LB had given her hotel key to the appellant so that he could retrieve items from her room, it is not unreasonable that the appellant believed ABE2 LB would not mind if he entered her room to reclaim his power cord. It is also not unreasonable that, given their history, he did not question ABE2 LB's apparent invitation to join her in the bed and engage in sexual activity. Finally, the fact that fibers similar to those from the appellant's underwear were found on ABE2 LB's underwear tends to support his description of pre-intercourse activity.

Furthermore, there are numerous issues with ABE2 LB's credibility. First, it appears she perjured herself, both on the witness stand and in her sworn statement to the Naval Criminal Investigative Service (NCIS). Two witnesses with no obvious motive to fabricate testified that they witnessed the appellant and ABE2 LB engage in sexual activity six months before the alleged assault. Yet, ABE2 LB unequivocally denied it. That she and the appellant had a previous sexual

13

relationship does not, of course, prove she consented to the sexual activity on 27 April. That she would seem to lie about this point in a court of law, however, casts doubt on the completeness and accuracy of her remaining testimony. Second, neither the vague testimony regarding ABE2 LB's alcohol consumption, nor the hotel video, supports that ABE2 LB was intoxicated to the extent that her purported lack of memory would imply. Third, the absence of any physical evidence to support her claim of being the victim of a forceful rape and attempted anal sodomy raises questions as to whether she embellished the facts to support her allegation. Similarly, it appears - in both her statement to NCIS and answers in the Sexual Assault Nurse Examination report - that ABE2 LB was selective in what facts she shared, withholding or denying facts that may have served to undermine her story.

This court need not be convinced that the appellant's description of events is true. As the burden of proof is not the appellant's, we need only determine whether the Government has disproven the appellant's affirmative defenses of consent and mistake of fact as to consent beyond a reasonable doubt. I find it has not. There is very little evidence aside from ABE2 LB's testimony that challenges the appellant's claim of consent or mistake of fact, and the issues surrounding ABE2 LB's veracity leave me questioning her version of events.

After weighing the evidence and judging the credibility of the witnesses, while noting my statutory obligation to "recognize that the trial court heard and saw the witnesses,"[24] I am not convinced of the appellant's guilt beyond a reasonable doubt. According, I would set aside the findings of guilty and dismiss Charge I and Specification 2 thereunder with prejudice.

For the Court

R.H. TROIDL
Clerk of Court

---

[24] Article 66(c), Uniform Code of Military Justice, 10 U.S.C. § 866(c).